Present:  All the Justices

JOHN ALLEN MUHAMMAD

v.  Record Nos. 041050 & 041051

OPINION BY JUSTICE DONALD W. LEMONS
April 22, 2005

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
LeRoy F. Millette, Judge

In these appeals, we consider two capital murder convictions and two death sentences imposed upon John Allen Muhammad ("Muhammad"), along with his convictions for conspiracy to commit capital murder and the illegal use of a firearm in the commission of murder.  This prosecution arose from the investigation of a series of sixteen shootings, including ten murders that occurred in Alabama, Louisiana, Maryland, Washington, D.C., and Virginia over a 47-day period from September 5 to October 22, 2002.  For the reasons discussed herein, the judgment of the trial court and the sentences of death will be affirmed.

I.  Facts and Proceedings Below

A.  Facts

On the morning of Wednesday, October 9, 2002, Dean H. Meyers ("Meyers") was shot and killed while fueling his car at the Sunoco gas station on Sudley Road in Manassas, Virginia. Meyers was shot in the head by a single bullet.  The bullet

entered behind his left ear, where it fragmented into multiple small pieces. The bullet fragments shattered the temporal bone and the fragments of bullet and bone then traveled through his brain and caused multiple fractures of his skull. This gunshot wound was consistent with injuries from a bullet fired from a high velocity rifle,[1] and was the cause of Meyers' death. Evidence at trial established that the bullet came from the .223 caliber Bushmaster rifle Muhammad possessed when he was arrested. An eyewitness testified that she saw Muhammad and Lee Boyd Malvo ("Malvo") in the vicinity of the shooting approximately one hour beforehand. Police interviewed Muhammad immediately after the shooting in a parking lot across the street from where Meyers was shot. In both encounters, Muhammad was driving a Chevrolet Caprice ("Caprice") in which he was later arrested. Muhammad's fingerprints were on a map police found in the parking lot where Muhammad had been interviewed.

Meyers was killed during a 47-day period, from September 5 to October 22, 2002, in which ten others were murdered and six more suffered gunshot wounds as a result of the acts of

---

[1] Throughout the trial, various witnesses and counsel made references to a high velocity rifle, high velocity weapon, and high velocity bullet, cartridge, or load. The technical distinctions between these terms are insignificant to the analysis in this opinion.

Muhammad and Malvo in concert.  The murder of Meyers was the twelfth of these sixteen shootings.

The first shooting occurred in Clinton, Maryland on September 5, 2002.  Paul J. LaRuffa ("LaRuffa"), the owner of Margellina's Restaurant, left the restaurant at closing and proceeded to his car with his briefcase and Sony portable computer.  Inside the briefcase were bank deposit bags that contained $3,500 in cash and credit card receipts from that evening.  LaRuffa placed the briefcase and laptop on the backseat of his car, and then sat behind the steering wheel. He testified that, almost immediately after he sat down, he saw a figure to his left and a flash of light.  He heard gunshots and the driver's side window shattered. When he stepped out of his car, he realized he had been shot.  The trauma surgeon who treated him testified that LaRuffa was shot six times:  once in the back left side of his neck, three times in the left side of his chest, and twice in his left arm.

An employee who left the restaurant with LaRuffa, Paul B. Hammer ("Hammer"), witnessed the shooting and called "911." Hammer testified that he saw a "kid" run up to LaRuffa's car, fire shots into it, and then open the rear door and take the briefcase and portable computer.  He was unable to provide a detailed description because of lighting conditions, but

3

testified that the shooter was a male in his late teens or early twenties. The briefcase and empty bank deposit bags, along with a pair of pants and a shirt, were found six weeks later in a wooded area about a mile from the shooting. Hair on the clothing yielded DNA that was consistent with Malvo's DNA.

Four days later, on September 9, Muhammad purchased a 1990 Caprice automobile from Christopher M. O'Kupski ("O'Kupski") in Trenton, New Jersey. O'Kupski testified that before the purchase, Muhammad got into the trunk and lay down. O'Kupski also testified that, when Muhammad purchased it, the Caprice did not have a hole in the trunk or a passageway from the backseat to the trunk; the trunk was not spray-painted blue; and the windows were not tinted.

The second shooting occurred in Clinton, Maryland on September 15, 2002. Muhammad Rashid ("Rashid") was closing the Three Roads Liquor Store. Rashid testified that he noticed the Caprice outside the store shortly before closing. He testified that he was in the process of locking the front door from the outside when he heard gunshots from behind him. At the same time, a young man with a handgun rushed towards Rashid and shot Rashid in the stomach. At trial, Rashid identified Malvo as the person who shot him. Two bullets were removed from inside the store. The bullets had been shot

4

through the front door and the trajectory of the bullets placed the shooter in a field across the street from the store.

The third and fourth shootings occurred in Montgomery, Alabama on September 21, 2002. Claudine Parker ("Parker") and Kelly Adams ("Adams") closed the Zelda Road ABC Liquor Store and walked out. They were shot immediately. Parker died as a result of a single gunshot wound that entered her back, transected her spinal cord, and passed through her lung. Adams was shot once through her neck, but lived. The bullet exited through her chin, breaking her jaw in half, shattering her face and teeth, paralyzing her left vocal cord, and severing major nerves to her left shoulder. Both gunshot wounds were consistent with injuries caused by a high velocity rifle. Testing revealed that the bullet fragments recovered from the Parker shooting were fired from a Bushmaster rifle possessed by Muhammad when he was arrested.

As the rifle shots were fired, a young man, later identified as Malvo, ran up to Parker and Adams. A police car happened to pass the scene immediately after the shots were fired. A police officer observed Malvo with a handgun. He was going through the women's purses. The officer and another eyewitness chased Malvo. Although he escaped, Malvo dropped an "ArmorLite" gun catalogue during the chase. At trial, both

5

the officer and the other eyewitness identified Malvo as the young man with the handgun who fled the scene. Additionally, Malvo's fingerprints were on the "ArmorLite" gun catalogue he dropped during the chase. The handgun Malvo carried that evening, a .22 caliber stainless steel revolver, was found in the stairwell of an apartment building that Malvo ran through during the chase. Forensic tests determined that this .22 caliber revolver was the same gun used to shoot both LaRuffa and Rashid.

The fifth shooting occurred in Baton Rouge, Louisiana on September 23. Hong Im Ballenger ("Ballenger"), the manager of the Beauty Depot store, closed the store for the evening. As she was walking to her car, she was shot once in the head with a bullet fired from a high velocity rifle. Ballenger died as the result of the single shot. The bullet entered the back of her head and exited through her jawbone. The wound caused massive bleeding and compromised her airway. Ballistic tests determined that the bullet fragments recovered from Ballenger were fired from the Bushmaster rifle possessed by Muhammad when he was arrested. An eyewitness saw a young man leave the scene with Ballenger's purse. At trial, this young man was identified as Malvo. Another eyewitness saw Malvo flee the scene with Ballenger's purse and get into the Caprice.

The sixth shooting occurred in Silver Spring, Maryland on October 3, 2002. At approximately 8:15 a.m., Premkumar A. Walekar ("Walekar") was fueling his taxicab. He was shot once with a bullet from a high velocity rifle. The bullet passed through his left arm and then entered his chest, where it broke two ribs, shredded portions of his lungs, and damaged his heart. A physician, who was fueling her car next to Walekar, attempted CPR but was unsuccessful. Ballistic tests established that bullet fragments recovered from the Walekar shooting were fired from the Bushmaster rifle possessed by Muhammad when he was arrested.

The seventh shooting occurred in Silver Spring, Maryland on October 3, 2002. At approximately 8:30 a.m., Sarah Ramos ("Ramos") was sitting on a bench in front of the Crisp & Juicy Restaurant in the Leisure World Shopping Center. She was shot once with a bullet from a high velocity rifle. The bullet entered the front of her head and exited through her spinal cord at the top of her neck. An eyewitness identified the Caprice at the scene prior to the shooting. Bullet fragments recovered from the Ramos shooting were fired from the Bushmaster rifle possessed by Muhammad when he was arrested.

The eighth shooting occurred in Kensington, Maryland on October 3, 2002. At approximately 10:00 a.m., Lori Lewis-Rivera ("Lewis-Rivera") was vacuuming her car at the Shell gas

station on the corner of Connecticut Avenue and Knowles Avenue. She was shot once in the back by a bullet from a high velocity rifle as she vacuumed her car. An eyewitness testified that he saw the Caprice in the vicinity of the gas station approximately 20 minutes before the shooting. Bullet fragments recovered from the Lewis-Rivera shooting were fired from the Bushmaster rifle possessed by Muhammad when he was arrested.

The ninth shooting occurred in Washington, D.C. on October 3, 2002. At approximately 7:00 p.m., a police officer stopped Muhammad for "running" two stop signs. The police officer testified that the windows of the Caprice were heavily tinted and that he could not see anyone else in the car. The police officer gave Muhammad a verbal warning and let him go.

At approximately 9:15 p.m. on that day, Paschal Charlot ("Charlot") was shot in the chest as he crossed the intersection of Georgia Avenue and Kalmia Road. This intersection was about 30 blocks from where the police officer stopped Muhammad. The bullet entered Charlot's chest and shattered his collarbone and three ribs before lacerating his lungs. Charlot died before emergency personnel arrived. Eyewitnesses testified that they saw the Caprice at the scene at the time of the shooting, and that the driver drove away without its headlights on immediately after the shooting. It

8

had been parked in a space on the street with its trunk positioned toward Georgia Avenue. One eyewitness testified that he saw a flash of light from the Caprice at the time the shot was fired. Ballistics tests determined that the bullet fragments recovered from the Charlot shooting were fired from the Bushmaster rifle possessed by Muhammad when he was arrested.

The tenth shooting occurred in Fredericksburg, Virginia on October 4, 2002. Caroline Seawell ("Seawell") had finished shopping at a Michael's Craft Store, and was putting her bags in her minivan, when she was shot once in the back by a bullet from a high velocity rifle. The bullet severely damaged her liver and exited through her right breast. Seawell survived the shooting. An eyewitness testified that he saw the Caprice in the parking lot at the time of the shooting. Ballistics tests determined that the bullet fragments recovered from the Seawell shooting were fired from the Bushmaster rifle possessed by Muhammad when he was arrested.

The eleventh shooting occurred in Bowie, Maryland on October 6, 2002. Tanya Brown ("Tanya") took Iran Brown ("Brown") to Tasker Middle School. As Brown was walking on the sidewalk to the school, he was shot once in the chest by a bullet from a high velocity rifle. Tanya decided not to wait for emergency personnel and drove Brown to a health care

9

center.  Brown's lungs were damaged, there was a large hole in his diaphragm, the left lobe of his liver was damaged, and his stomach, pancreas, and spleen were lacerated by bullet fragments.  Surgeons were able to save Brown's life and he spent eight weeks recovering in the hospital.

Two eyewitnesses testified that they saw the Caprice in the vicinity of Tasker Middle School the day before the shooting and the morning of the shooting.  One of these eyewitnesses positively identified both Muhammad and Malvo in the Caprice the morning of the shooting.  They were seen in the Caprice which was parked at an intersection with a line of sight to the school.  Following the shooting, police searched the surrounding area and found a ballpoint pen and a shell casing in the woods next to the school.  The pen and shell casing were located in an area that had been patted down like a hunting blind.  This blind offered a clear line of sight to the scene of the shooting.  Tissue samples from the pen matched Muhammad's DNA.  The shell casing had been fired by the Bushmaster rifle possessed by Muhammad when he was arrested, and tests determined that the bullet fragments recovered from Brown were fired from that rifle.

In the woods, police also found the first communication from Muhammad and Malvo.  A tarot card, the one for death, was found with handwriting that stated, "Call me God."  On the

back of the card was handwriting that stated, "For you, Mr. Police.  Code:  Call me God.  Do not release to the Press."

The twelfth shooting, discussed above, was the murder of Dean Meyers in Manassas, Virginia on October 9, 2002.

The thirteenth shooting occurred in Massaponax, Virginia on October 11, 2002.  Kenneth Bridges ("Bridges") was at an Exxon gas station on Jefferson Davis Highway.  He was shot once in the chest by a bullet from a high velocity rifle.  The bullet damaged his lungs and heart, causing fatal internal injuries.  Two eyewitnesses testified that they saw the Caprice at or near the Exxon station on the morning of the shooting.  Ballistics tests determined that the bullet fragments recovered from the Bridges shooting were fired from the Bushmaster rifle possessed by Muhammad when he was arrested.

The fourteenth shooting occurred in Falls Church, Virginia on October 14, 2002.  Linda Franklin ("Franklin") and her husband were shopping at a Home Depot store.  As they loaded their purchases in their car, Franklin was shot and killed by a single bullet from a high velocity rifle.  The bullet entered the left side of her head, passed through her brain and skull, and exited from the right side of her head.  An off-duty police officer testified that she saw Malvo driving the Caprice in the vicinity of the shooting

immediately after it occurred. Tests determined that bullet fragments recovered from the Franklin shooting were fired from the Bushmaster rifle possessed by Muhammad when he was arrested.

On October 15, the day after Franklin was murdered, a Rockville, Maryland police dispatcher received a telephone call in which the caller stated:

> Don't say anything, just listen, we're the people who are causing the killings in your area. Look on the tarot card, it says, "call me God, do not release to press." We've called you three times before trying to set up negotiations. We've gotten no response. People have died.

The dispatcher attempted to transfer the call to the Sniper Task Force, but the caller hung up.

Three days later, on October 18, Officer Derek Baliles ("Officer Baliles"), a Montgomery County, Maryland Police Information Officer, received a telephone call. The caller told Officer Baliles to "shut up" and stated that he knew who was doing the shootings, but wanted the police officer to verify some information before he talked further. The caller told Officer Baliles to verify information concerning a shooting at a liquor store near "Ann Street." The caller gave Officer Baliles the name and telephone number of a police officer in Alabama. Officer Baliles confirmed the shootings

of Parker and Adams.  The caller called Officer Baliles again.
Officer Baliles told him that he had verified the information
concerning the shootings of Parker and Adams.  The caller then
said that he had to find more coins for the call and had to
find a telephone without surveillance and then hung up.

On the same day, William Sullivan ("Sullivan"), a priest
in Ashland, Virginia, received a telephone call from two
people.  The first voice, a male, told him someone wanted to
speak with him.  Sullivan testified that a second male voice,
told him that "the lady didn't have to die," and "it was at
the Home Depot."  The second voice also told him about a
shooting at a liquor store in Alabama and then said, "Mr.
Policeman, I am God.  Do not tell the press."  The second
voice concluded by telling Sullivan to give this information
to the police.

The fifteenth shooting occurred in Ashland, Virginia on
October 19, 2002.  Jeffrey Hopper ("Hopper") and his wife
stopped in Ashland to fuel their car and eat dinner.  They
left the restaurant and were walking to their car when Hopper
was shot in the abdomen.  Hopper survived the shooting, but
underwent five surgeries to repair his pancreas, stomach,
kidneys, liver, diaphragm, and intestines.  In the woods near
the shooting, police found a hunting-type blind similar to the
one found at the Brown shooting.  At the blind, police found a

13

shell casing, a plastic sandwich bag attached to a tree with a thumbtack at eye level that was decorated with Halloween characters and self-adhesive stars, and a candy wrapper. Tests determined that the shell casing and bullet fragments recovered from the Hopper shooting came from the Bushmaster rifle possessed by Muhammad when he was arrested. Surveillance videotapes identified Muhammad in a Big Lots Store on October 19, 2002 near the shooting from which the plastic sandwich bag and decorations were likely obtained. The candy wrapper contained both Malvo's and Muhammad's DNA.

Police also found a handwritten message in the plastic sandwich bag that read:

> For you Mr. Police.  "Call me God."
> Do not release to the Press.
> We have tried to contact you to start negotiation . . . These people took our call for a Hoax or Joke, so your failure to respond has cost you five lives.
> If stopping the killing is more important than catching us now, then you will accept our demand which are non-negotiable.
> (i)  You will place ten million dollar in Bank of america account . . . We will have unlimited withdrawl at any atm worldwide.  You will activate the bank account, credit card, and pin number.  We will contact you at Ponderosa Buffet, Ashland, Virginia, tel. # . . . 6:00 am Sunday Morning.  You have until 9:00 a.m. Monday morning to complete transaction. "Try to catch us withdrawing at least you will have less body bags."
> (ii)  If trying to catch us now more important then prepare you body bags.

14

> If we give you our word that is what takes place.
> "Word is Bond."
> P.S.  Your children are not safe anywhere at anytime.

The note was not found until after the deadline had passed. The day after Hopper was shot at the Ponderosa, an FBI agent operating the "Sniper Tip Line" received a call from a young male who said, "Don't talk.  Just listen.  Call me God.  I left a message for you at the Ponderosa.  I am trying to reach you at the Ponderosa.  Be there to take a call in ten minutes."

On October 21, 2002, an FBI agent received a call to the FBI negotiations team which had been re-routed from the Ponderosa telephone number referenced in the note left after the Hopper shooting.  A recorded voice stated:

> Don't say anything.  Just listen.  Dearest police, Call me God.  Do not release to the press.  Five red stars.  You have our terms. They are non-negotiable.  If you choose Option 1, you will hold a press conference stating to the media that you believe you have caught the sniper like a duck in a noose.  Repeat every word exactly as you heard it.  If you choose Option 2, be sure to remember we will not deviate.  P.S. – Your children are not safe.

The sixteenth shooting occurred in Aspen Hill, Maryland on October 22, 2002.  At approximately 6:00 a.m., Conrad Johnson ("Johnson"), a bus driver for the Montgomery County Transit Authority, was shot in the chest at the entrance to

15

his bus.  Johnson remained conscious until rescue workers arrived, but died at the hospital.  A single high velocity rifle bullet killed Johnson.  The bullet entered his right chest, and caused massive damage to his diaphragm, liver, pancreas, kidneys, and intestines.  Tests determined that the bullet fragments recovered from the Johnson shooting were fired from the Bushmaster rifle possessed by Muhammad when he was arrested.  A hunting-type blind, similar to those found at the Brown and Hopper shootings, was found in the woods near where Johnson was shot.  A black duffle bag and a left-handed glove were found.  A hair from the duffle bag yielded DNA that matched Muhammad's DNA.  The police also found another plastic sandwich bag which contained a note and self-adhesive stars.

Muhammad and Malvo were captured and arrested on October 24, 2002, by agents of the FBI at a rest area in Frederick County, Maryland.  They were asleep in the Caprice at the time of their capture.  Inside the Caprice, police found a loaded .223 caliber Bushmaster rifle behind the rear seat.  Tests determined that the DNA on the Bushmaster rifle matched the DNA of both Malvo and Muhammad.  The only fingerprints found on the Bushmaster rifle were those of Malvo.

The Caprice had been modified after Muhammad purchased it from O'Kupski.  The windows were heavily tinted.  The rear seat was hinged, providing easy access to the trunk from the

passenger compartment.  The trunk was spray-painted blue.  A hole had been cut into the trunk lid, just above the license plate.  The hole was blocked by a right-handed brown glove that matched the left-handed glove found in the woods near the Johnson shooting.  The trunk also had a rubber seal that crossed over the hole.

Inside the Caprice, police found a global positioning system (GPS) receiver, a magazine about rifles, an AT&T telephone charge card, ear plugs, maps, plastic sandwich bags, a rifle scope, .223 caliber ammunition, "walkie-talkies," a digital voice recorder, a receipt from a Baton Rouge, Louisiana grocery store dated September 27, 2002, an electronic organizer, a plastic bag from a Big Lots Store, a slip of paper containing the Sniper Task Force phone number, and a list of schools in the Baltimore area.

Police also found LaRuffa's portable computer in the Caprice.  Muhammad had loaded software entitled "Microsoft Streets and Trips 2002" onto this computer on September 29, 2002.  In this program, there were various maps showing particular routes and places marked with icons, some with a skull and crossbones.  Icons had been added to mark the places where Walekar, Lewis-Rivera, Seawell, Brown, Meyers and Franklin were shot.  There was also a Microsoft Word file

titled "Allah8.rtf" that contained portions of the text communicated to police in the extortion demands.

## B. Proceedings Below

Subsequent to his arrest on October 24, 2002, Muhammad was indicted by a grand jury on October 28, 2002, for the capital murder of Meyers in the commission of an act of terrorism, Code §§ 18.2-31(13) and 18.2-46.4; capital murder of Meyers and at least one other person within a three-year period, Code § 18.2-31(8); conspiracy to commit capital murder, Code §§ 18.2-22 and 18.2-32; and illegal use of a firearm in the commission of capital murder, Code § 18.2-53.1.

Muhammad waived his right to a speedy trial on November 13, 2002. Upon motion by Muhammad, and without objection by the Commonwealth, venue was changed from the Circuit Court of Prince William County to the Circuit Court of the City of Virginia Beach.

From October 20 through November 17, 2003, Muhammad was tried before a jury in the Circuit Court of the City of Virginia Beach. The jury convicted Muhammad of all charges in the grand jury indictments. In a separate sentencing proceeding from November 17 through November 24, 2003, the jury sentenced Muhammad to two death sentences for the capital murder convictions, finding both the future dangerousness and vileness aggravating factors. The jury also sentenced

18

Muhammad to 13 years in prison upon the remaining convictions. At the conclusion of the sentencing proceeding, venue was transferred back to the Circuit Court of Prince William County.

On March 9, 2004, the trial court imposed the two death sentences and the sentences of imprisonment as fixed by the jury. A final sentencing order was entered on March 29, 2004.

Muhammad noted appeals of his convictions. On May 7, 2004, this Court certified Muhammad's appeals of his non-capital convictions under Code § 17.1-409 for consolidation with the appeals of his capital murder convictions and the review mandated by Code § 17.1-313.

We will recite additional facts and incidents of trial as necessary in context as specific assignments of error are considered.

## II.  Preliminary Issues

### A.  Issues Abandoned or Waived

Muhammad advances 102 assignments of error in his appeal. The Commonwealth maintains that Muhammad failed to sufficiently argue in his brief assignments of error 33, 34, 43, 45, 47, 52, 53, 68, 70, 78, 79, 80, 82, 83, 88, and 96. Rules 5:17(c)(4) and 5:27 require that a brief contain "[t]he principles of law, the argument, and the authorities relating to each assignment of error," and further require that "[w]ith

respect to each assignment of error, the principles, the argument, and the authorities shall be stated in one place and not scattered through the petition."  In his reply brief, Muhammad contests the Commonwealth's assertion only as to assignments of error 43, 52, 78, 79, 80, 81, and 83.[2] Accordingly, assignments of error 33, 34, 45, 47, 53, 68, 70, 82, 88, and 96 are waived.  Consequently, we will consider only assignments of error 43, 52, 78, 79, 80 and 83 as being in controversy.

Assignment of error 43 pertains to the admission of crime scene and autopsy photographs.  Assignment of error 52 refers to testimony of Officer Cindy Martin concerning her observations of "brain matter" at the scene of the Ramos shooting.  With respect to both of these assignments, there is insufficient argument in the brief.  Having been directed by Muhammad to particular page citations where he claims to have presented these arguments, we agree with the Commonwealth's observation that Muhammad merely restates his assignment of error and makes reference to pages in the appendix where his trial court arguments can be found.  We have previously held that such a practice is improper and is insufficient to meet the requirements of our Rules.  Schmitt v. Commonwealth, 262

[2] The Commonwealth did not claim that Muhammad waived assignment of error 81.

20

Va. 127, 138, 547 S.E.2d 186, 194 (2001), cert. denied, 534 U.S. 1094 (2002).  Failure to adequately brief an assignment of error is considered a waiver.  Powell v. Commonwealth, 267 Va. 107, 135, 590 S.E.2d 537, 554, cert. denied, ___ U.S. ___, 125 S.Ct. 86 (2004).  Therefore, assignments 43 and 52 are deemed waived.

The remaining assignments of error claimed by the Commonwealth to be waived by lack of argument pertain to unadjudicated criminal conduct evidence presented at the bifurcated sentencing proceeding.  Assignment of error 78 refers to evidence of the killing of Kenya Cook in Tacoma, Washington.  Assignment of error 79 refers to a shooting into Temple Beth El Synagogue in Tacoma, Washington.  Assignment of error 80 refers to testimony about the presence of a .308 caliber rifle found pointing to a particular apartment in Tacoma, Washington.  Assignment of error 83 refers to evidence of a sharpened spoon handle in Muhammad's cell in the Prince William County jail.

For each of these assignments of error related to unadjudicated criminal conduct, Muhammad cites pages in the section of his brief entitled "Statement of Facts" and one page in the "Argument" section of his brief.  The references in the "Statement of Facts" are to arguments made in the trial proceeding.  Even giving Muhammad the benefit of examining

additional pages of his brief not referred to as the location of his argument, Muhammad does not make particularized arguments in his brief concerning each of the categories of evidence he finds objectionable, except for evidence of the alleged escape attempt contained in assignment of error 81, which the Commonwealth agrees was not waived.  Assignments of error 80 and 83 raise issues of lack of notice of presentation of unadjudicated criminal conduct; however, there is no argument of the question in the brief itself.  Assignments of error 78, 79, 80, and 83 are not sufficiently argued in the brief.  We will not consider them.  Rule 5:17(c)(4); Rule 5:27; Elliott v. Commonwealth, 267 Va. 396, 422, 593 S.E.2d 270, 286 (2004), cert. denied, ___ U.S. ___, 125 S.Ct. 875 (2005); Williams v. Commonwealth, 248 Va. 528, 537, 450 S.E.2d 365, 372 (1994), cert. denied, 515 U.S. 1161 (1995).

   B.  Sufficiency of the Commonwealth's Capital Murder
   Theories and of the Evidence to Support These Theories

   We first address the dominant issue presented in this case, namely the legal viability of the Commonwealth's theories of capital murder and the sufficiency of the evidence to support its theories.  Muhammad's assignments of error 63–69, 71-74, 97, and 102, present these issues.  We review questions of law, and mixed questions of law and fact, utilizing a de novo standard of review.  Quatannens v.

22

*Tyrrell*, 268 Va. 360, 365, 601 S.E.2d 616, 618 (2004), McCain v. Commonwealth*, 261 Va. 483, 489-90, 545 S.E.2d 541, 545 (2001).

In accordance with established principles of appellate review, we state the facts in the light most favorable to the Commonwealth, the prevailing party in the trial court.  We also accord the Commonwealth the benefit of all inferences fairly deducible from the evidence.  Riner v. Commonwealth*, 268 Va. 296, 303-04, 601 S.E.2d 555, 558-59 (2004), Armstrong v. Commonwealth, 263 Va. 573, 576, 562 S.E.2d 139, 140 (2002); Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).

There is no distinction in the law between the weight or value to be given to either direct or circumstantial evidence. The finder of fact is entitled to consider all the evidence, without distinction, in reaching its determination. Commonwealth v. Hudson*, 265 Va. 505, 512-13, 578 S.E.2d 781, 785, cert. denied, 540 U.S. 972 (2003).  Circumstantial evidence is not viewed in isolation.  While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.  Id. at 514, 578 S.E.2d at 786.  We will set aside the judgment only if it is clearly wrong or unsupported by the

23

evidence.  *Powell v. Commonwealth,* 268 Va. 233, 236, 602 S.E.2d 119, 120-21 (2004).

The jury found Muhammad guilty of capital murder under two separate provisions of Virginia law: Code § 18.2-31(8) for the "willful, deliberate, and premeditated killing of more than one person within a three-year period;" and Code § 18.2-31(13) for the "willful, deliberate and premeditated killing of any person by another in the commission of or attempted commission of an act of terrorism."  Among the challenges made, Muhammad argues that the trial court erred in permitting a legally flawed "triggerman" theory to be presented to the jury as a result of various rulings and instructions. Muhammad further argues that, even under the Commonwealth's theory, the evidence was insufficient to prove that he was the so-called "triggerman."  Also, Muhammad challenges the sufficiency of the evidence to support his capital murder conviction based upon acts of terrorism.  His constitutional challenges to the capital murder statute based upon terrorism are addressed elsewhere in this opinion.

### 1. Capital Murder Conviction Based Upon Murder of More Than One Person in Three Years

#### (a) Sniper Team Theory

The Commonwealth introduced the testimony of Sergeant Major Mark Spicer ("Spicer") of the British Armed Forces as an

expert in sniper methodology.  His testimony and the direct and circumstantial evidence presented to the jury are more than sufficient to support, beyond a reasonable doubt, Muhammad's conviction for the capital murder of Dean Meyers and others within three years.

Spicer testified that "sniping is the ability of two men to go out and inflict injuries or kill people and more importantly spread terror across a much larger force."  While acknowledging that a sniper can act alone or in a team of three, he stated, "the basic unit for a sniper team . . . is . . . a two-man unit."  Spicer testified at length about the distinct responsibilities of each member of a two-man sniper unit.  Essentially, one member of the team is the long-range shooter occupying an obscured position with the opportunity to shoot a particular victim.  Because of the intensity and discipline required to take advantage of the narrow window of opportunity to take the long-range shot, the other member of the team, the "spotter," informs the long-range shooter by radio that the victim is coming within the zone of potential fire and that other circumstances are ripe for the shot.  The "spotter" may ultimately give the order to shoot.

Spicer connected the evidence found by police investigators in this case to the tools and methods ordinarily used by a sniper team.  The .223 caliber Bushmaster rifle used

in at least ten of the shootings, including Dean Meyers, is equivalent to the M4 rifle used by military snipers. Additionally, sniper teams use tools such as those found in the Caprice: a bipod support system for support of the rifle; holographic and telescopic scopes to aid sighting; GPS equipment to locate and relocate a vantage point for the long-range shot; "walkie-talkie" handheld radio sets for communication; pocket recording equipment for recording data in the dark, bungee cords for easy "break down" of the rifle for transportation; maps; silencers.

Spicer also testified about the methodology of a sniper team which was supported by the evidence in this case. Spicer emphasized the constant training with the rifle to maintain skills, the creation of a camouflaged location for firing, the use of existing traffic to facilitate escape, and the "team" approach with a "spotter" who is armed with a handgun and may additionally participate in the assault by firing from close range.

With regard to the Caprice, Spicer testified about the alterations made to it to facilitate the methodology of the sniper team. The rear firewall had been removed from the Caprice to provide entry into the trunk from the passenger compartment. The trunk compartment had been spray-painted a

dark color to minimize contrast and shadow to avoid detection in the event the trunk was opened.

Finally, Spicer gave particular significance to the peculiar hole placed in the back of the trunk lid that enlarged the field of vision while minimizing the ability to see the person in the trunk. He referred to this special process as implementing the "castle principle" making reference to ancient methods of protecting the castle while minimizing danger to the shooter and maximizing the range of fire.

The Commonwealth presented compelling evidence that such a sniper team methodology was used by Muhammad and Malvo in multiple shootings prior to and after the murder of Dean Myers. Perhaps no one or two incidents could reasonably confirm the use of this methodology by the two perpetrators of this unique criminal enterprise. But in its entirety, the weight of the direct and circumstantial evidence in the case is sufficient to prove that Muhammad and Malvo acted together as a sniper team.

### (b) Jury Instructions on Multiple Homicide Theory of Capital Murder

Muhammad was convicted under Code § 18.2-31(8), of the willful, deliberate, and premeditated killing of Dean Meyers and others within a three-year period. He maintains, "Only

27

the immediate perpetrator of a homicide, the one who fired the fatal shot, and not an accessory before the fact or a principal in the second degree, may be convicted of capital murder."  He claims that under the Commonwealth's theory of the case, Muhammad could never be the "triggerman" as defined in our cases.

> It is well-established that in felony cases:
>
> A principal in the first degree is the actual perpetrator of the crime.  A principal in the second degree, or an aider or abettor as he is sometimes termed, is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime. In order to make a person a principal in the second degree actual participation in the commission of the crime is not necessary.  The test is whether or not he was encouraging, inciting, or in some manner offering aid in the commission of the crime.  If he was present lending countenance, or otherwise aiding while another did the act, he is an aider and abettor or principal in the second degree.

Jones v. Commonwealth, 208 Va. 370, 372-73, 157 S.E.2d 907, 909 (1967).  A principal in the second degree "must share the criminal intent of the actual perpetrator or be guilty of some overt act."  Hall v. Commonwealth, 225 Va. 533, 536, 303 S.E.2d 903, 904 (1983).  That there may be more than one principal in the first degree for a particular offense is beyond dispute:

> Where two people engage in criminal conduct together, as where they participate in

28

striking and killing another, each participant is a principal in the first degree in the homicide. Likewise, where part of a crime is committed in one place and another part is committed in a different place, the author of each part is a principal in the first degree.

1 Wharton's Criminal Law § 30 (15th ed. 1993).

Generally in Virginia, a principal in the second degree is subject to the same punishment as the principal in the first degree. Taylor v. Commonwealth, 260 Va. 683, 687-88, 537 S.E.2d 592, 594 (2000). However, with the exception of capital murder prosecutions for a killing for hire, or a killing pursuant to the direction or order of one who is engaged in a continuing criminal enterprise, or a killing pursuant to the direction or order of one who is engaged in the commission of or attempted commission of an act of terrorism, "an accessory before the fact or principal in the second degree to a capital murder shall be indicted, tried, convicted and punished as though the offense were murder in the first degree." Code § 18.2-18. Accordingly, pursuant to the charge of capital murder based upon killing of two or more persons within a three-year period, the Commonwealth must prove that Muhammad was a principal in the first degree.

The euphemism, "triggerman," is inadequate to describe the breadth of criminal responsibility subject to the death penalty in Virginia. Immediately and obviously, capital

murder cases are not confined to murders completed by the instrumentality of a firearm. Recognizing this inadequacy, our capital murder cases routinely use the term "immediate perpetrator" as the appropriate descriptive term. The term is not new, having been used as early as 1880 in our case law. Mitchell v. Commonwealth, 74 Va. (33 Gratt.) 845, 868 (1880).

Muhammad argues in assignments of error 66 and 69 that the trial court erred in giving instructions 4 (capital murder finding instruction) and 9 (defining principals in the first and second degree), and further argues in assignments of error 71 and 73 that the trial court erred in refusing to give his proffered instruction J (concerning multiple killings) and L (concerning the definition of a principal in the first and principal in the second degree). Muhammad's quarrel with the instructions is a function of his disagreement over the scope of the concept of "immediate perpetrator" for the purposes of the capital murder statutes. He further argues that the instructions at issue confuse the concept of principal in the first degree with the requirements of principal in the second degree and undermine the concept of "aiding and abetting."

Instruction 4 required Muhammad to be a "princip[al] in the first degree, as defined in Instruction No. 9" for the jury to convict for capital murder. The pertinent part of Instruction 9 states:

> A principal in the first degree is the immediate perpetrator of the offense.
>
> Where two or more persons take a direct part in inflicting fatal injuries, each joint participant is an immediate perpetrator for the purpose of proving capital murder.
>
> The principal in the second degree is a person who is present, aiding and abetting, by helping in some way in the commission of the crime. Presence and consent alone are not sufficient to constitute aiding and abetting. It must be shown the Defendant, John Allen Muhammad, intended his word, gestures, signals or actions to in some way, encourage, advise or urge, or in some way help the person committing the crime commit it . . . .

In Strickler v. Commonwealth, 241 Va. 482, 404 S.E.2d 227, cert. denied, 502 U.S. 944 (1991), we reviewed a capital murder conviction wherein the "Commonwealth's theory of the case was that Strickler and Henderson had acted jointly to accomplish the actual killing" of the victim by crushing her skull with a 69-pound rock. Id. at 494, 404 S.E.2d at 235. The evidence was consistent with the Commonwealth's argument that one of the two men held the victim immobile while the other dropped or threw the rock on her head. Citing Coppola v. Commonwealth, 220 Va. 243, 256-57, 257 S.E.2d 797, 806 (1979), cert. denied, 444 U.S. 1103 (1980), where we held that a defendant who "jointly participated in [a] fatal beating" was subject to conviction and punishment for capital murder, we restated the rule of culpability for capital murder as follows:

> We adhere to the view that where two or more
> persons take a direct part in inflicting fatal
> injuries, each joint participant is an
> "immediate perpetrator" for the purposes of
> the capital murder statutes.

Strickler, 241 Va. at 495, 404 S.E.2d at 235.  This rule has been reaffirmed in several cases since Strickler.  See Lenz v. Warden, 265 Va. 373, 381, 579 S.E.2d 194, 199 (2003); Remington v. Commonwealth, 262 Va. 333, 349-50, 551 S.E.2d 620, 630 (2001), cert. denied, 535 U.S. 1062 (2002); Williams, 248 Va. at 545, 450 S.E.2d at 376; Hancock v. Commonwealth, 12 Va. App. 774, 779-81, 407 S.E.2d 301, 304-05 (1991).

In Lenz and Remington, two criminal actors were immediate perpetrators because they "jointly participated in the fatal stabbing."  Remington, 262 Va. at 350, 551 S.E.2d at 630.  Another category of multiple actors who may be immediate perpetrators was established in Strickler.  The Court held that the evidence supported the Commonwealth's theory that one actor held the victim while the other actor dropped a large rock on her head.  We observed that "it would have been necessary that she be held down by one assailant while the other lifted the rock and dropped it on her head."  Strickler, 241 Va. at 494, 404 S.E.2d at 235.  As established in Strickler, conduct of two criminal actors may be such that they jointly complete the criminal act.  It is not a matter of encouraging, advising, urging, or facilitating another in the

32

commission of the crime.  It is the actual participation together in a unified act that permits two or more persons to be immediate perpetrators.  In Strickler, the Commonwealth advanced its theory concerning how the murder was accomplished.  Our review on appeal considered whether the evidence supported the theory.

Similarly, we must consider the evidence in support of the Commonwealth's theory of how Muhammad and Malvo acted together in the murder of Dean Meyers.  Spicer's expert testimony, the evidence recovered from the Caprice, the evidence from the 16 shootings, and the additional evidence concerning Malvo and Muhammad's relationship and activities support the Commonwealth's theory of the case.  Muhammad and Malvo and the Caprice were identified in the immediate vicinity of Dean Meyers' murder approximately one hour before it occurred.  Immediately after the murder, Muhammad was identified in the parking lot across the street from where Meyers was shot.  Muhammad was driving the Caprice in which he and Malvo were later arrested.  Ballistics tests determined that the bullet that killed Meyers was shot from the .223 caliber Bushmaster rifle found in the Caprice with Muhammad and Malvo when they were arrested.  The Caprice was located in a position providing a direct line of fire to accomplish the murder.  Significantly, the shot from the parking lot had to

33

cross nine lanes of traffic on a heavily traveled highway at approximately 8:15 p.m. on a weekday evening.  With the relatively small portal offered by the hole in the trunk of the Caprice and the obstacle presented by nine traffic lanes, the evidence supports the Commonwealth's theory of a "shooter" and a "spotter" and the direction by the spotter to shoot at the opportune time.  As in Strickler, we review the evidence in the light most favorable to the Commonwealth to determine if it is sufficient to support the Commonwealth's theory.  241 Va. at 485, 404 S.E.2d at 230.  Upon review of that evidence, we cannot say that the trial court was plainly wrong or without evidence to support its judgment.

The jury instructions given by the trial court accurately conveyed applicable law without confusion to the jury. Furthermore, Instructions J and L offered by Muhammad did not embrace a correct definition of immediate perpetrator and were properly refused by the trial court.

The theory of the Commonwealth concerning multiple immediate perpetrators acting as principals in the first degree accurately encompasses Virginia law.  The jury instructions in question properly instructed the jury on the law and the facts of the case.

2.  Capital Murder in the Commission
of an Act of Terrorism

## (a)  Sufficiency of Evidence

Muhammad was also convicted of capital murder pursuant to Code § 18.2-31(13) for the willful, deliberate, and premeditated killing of Dean Meyers in the commission of an act of terrorism as defined in Code § 18.2-46.4.  Code § 18.2-46.4 defines an "act of terrorism" as

> an act of violence as defined in clause (i) of subdivision A of § 19.2-297.1 committed with the intent to (i) intimidate the civilian population at large; or (ii) influence the conduct or activities of the government of the United States, a state or locality through intimidation.

Code § 19.2-297.1 includes, among the acts of violence the offenses of first and second degree murder, voluntary manslaughter, malicious wounding, and robbery.  Additionally, Code § 18.2-18 provides that a person convicted of capital murder under Code § 18.2-31(13) is not required to be a principal in the first degree to the murder if the killing was "pursuant to the direction or order of the one who is engaged in the commission of . . . an act of terrorism."

Significantly, Muhammad does not contest the sufficiency of evidence to support the charge that acts of violence committed by him and Malvo were done with the intent to "intimidate the civilian population at large" or to "influence the conduct or activities of the government of the United States, a state or locality through intimidation."  Rather, he

35

challenges his conviction for capital murder based upon the terrorism predicate by attacking the validity of the statute, constitutionally and otherwise, and by challenging the sufficiency of the evidence that he "directed" or "ordered" Malvo with respect to the killing of Dean Meyers.  We will consider Muhammad's challenge to the validity of the statute elsewhere in this opinion.

The Commonwealth argues that the evidence is sufficient to support two separate evidentiary theories upon which Muhammad's conviction for capital murder in the commission of an act of terrorism is based.  One theory is based upon Muhammad committing the murder of Dean Meyers as a principal in the first degree because he is an immediate perpetrator of the crime.  The second evidentiary theory is based upon Muhammad giving a direction or order to Malvo to kill Dean Meyers.  Either or both theories are sufficient to sustain the proof necessary to affirm Muhammad's conviction for capital murder in the commission of an act of terrorism.

As stated above, the proof is sufficient to establish beyond a reasonable doubt that Muhammad acted as a principal in the first degree, as an immediate perpetrator, in the death of Dean Meyers.  The "sniper theory" advanced by the Commonwealth is supported through Spicer's expert testimony, the ample evidence of such a methodology, and our prior

decisions.  As an immediate perpetrator of the death of Dean

Meyers in a murder that qualifies as an act of violence under

Code § 19.2-297.1, Muhammad was a principal in the first

degree in the "willful, deliberate, and premeditated killing

of [a] person . . . in the commission . . . of an act of

terrorism."  Code § 18.2-31(13).

Additionally, the combined weight of direct and

circumstantial evidence is sufficient to sustain Muhammad's

conviction even if he is considered to have been a criminal

actor in the second degree who gave an order or direction to

Malvo to kill Dean Meyers.  Malvo and Muhammad were seen in

the Caprice in the vicinity of Meyers' shooting approximately

one hour beforehand.  The Caprice was the same vehicle in

which Muhammad and Malvo were arrested.  It was altered to

provide access to the trunk from the inside and a portal for

firing a rifle through the trunk lid.  Muhammad was

interviewed by police immediately after the shooting in a

parking lot across the street from where Meyers was shot.

Malvo was not seen at the parking lot.  There was a direct

line of fire between the parking lot and the Sunoco station

where Meyers was shot.  Between the parking lot and the site

where Meyers was shot were nine traffic lanes.  The evidence

shows that Malvo and Muhammad possessed the .223 caliber

Bushmaster rifle, mittens with open fingers, a GPS receiver,

earplugs, maps, rifle scopes, "walkie-talkies," a voice recorder, an electronic organizer, and other evidence previously described. The evidence proves that the bullet that killed Dean Meyers came from the .223 caliber Bushmaster rifle in the possession of Muhammad and Malvo when they were arrested. The evidence also contains direct or circumstantial proof of instances where the two men committed similar crimes together.

Muhammad and Malvo were seen nearby in the Caprice immediately before the murder of Dean Meyers. Only Muhammad was seen immediately afterward. The weight of the evidence supports the conclusion that either Muhammad or Malvo fired the fatal shot that killed Dean Meyers. If it was Muhammad, he is a principal in the first degree, with or without the sniper theory advanced by the Commonwealth. The evidence more reasonably proves that Malvo was the shooter and was in the converted trunk when Muhammad was interviewed in the parking lot immediately after the murder.

The circumstances of this murder are consistent with the expert testimony concerning a two-man sniper team. As Spicer testified, the "spotter" sets up the shot at a position safe from view yet within range of the target. In this case, the relatively limited range of the shooter in the trunk of the car requires split-second timing to successfully hit a target

that quickly comes into range and just as quickly moves out of range. This abbreviated window of opportunity is made all the more difficult by nine lanes of traffic passing between the shooter and the target. According to Spicer, the job of the spotter is to communicate with the shooter, give the order or direction, and then to provide an undetected getaway.

Furthermore, the record is replete with evidence that Muhammad directed and ordered Malvo in the entire criminal enterprise. As the Commonwealth argued based upon evidence presented:

> It was Muhammad who brought Malvo to this country from Jamaica. It was Muhammad who had the military background in shooting and snipering skills and who trained Malvo. It was Muhammad who provided the weapons. It was Muhammad who was determined to terrorize his ex-wife's area of the country. It was Muhammad who was the "father" and Malvo who was the "son." All the evidence about their relationship – from the Lighthouse Mission and friends in Washington state to Muhammad's cousin in Baton Rouge and the YMCA personnel in Maryland – consistently showed Muhammad directing and ordering Malvo's conduct. Everyone who saw them together observed that Malvo was extremely obedient to Muhammad, not the other way around.

On this issue, the trial court held that there was "overwhelming circumstantial evidence regarding [Muhammad's] direction and ordering of Mr. Malvo." Upon review of the evidence, we cannot say that the trial court was clearly wrong

or without evidence to support this conclusion.  Powell, 268 Va. at 236, 602 S.E.2d at 120-21.

We hold that Muhammad was an immediate perpetrator and as such was a principal in the first degree in the commission of capital murder during the commission of an act of terrorism. We further hold that the evidence proves that Muhammad gave a direction or order sufficient to satisfy the requirements of Code § 18.2-18 such that even if he were a criminal actor ordinarily demonstrating culpability as a principal in the second degree, he is nonetheless guilty of capital murder under Code §§ 18.2-31(13) and 18.2-18.

### (b)  Jury Instructions on the Terrorism Capital Offense

Muhammad maintains that it was error for the trial court to give Instructions 5 and 6 and to refuse his Instructions K and M. (Assignments of Error 67, 68, 72, 74).  Assignment of error 68 regarding instruction 6 has been waived for failure to brief the issue.  Upon review of the evidence and the instruction, we hold that the trial court did not err in granting instruction 5.  With respect to Muhammad's proffered instructions K and M, he states in his brief only that they properly addressed the terrorism issues.  There is no argument concerning why it would be error to refuse them in light of

40

the other instructions given.  We will not consider this argument.  Rule 5:17(c).

C.  Alleged Inconsistent Prosecution Theories

The independently elected Commonwealth's Attorneys of Prince William County and Fairfax County maintained contemporaneous prosecutions of Muhammad and Malvo.  In Fairfax County, Malvo was prosecuted for the murder of Linda Franklin wherein Malvo interposed an insanity defense.  In Prince William County, Muhammad was prosecuted for the murder of Dean Meyers.  Much of the same evidence was utilized in each prosecution.  In assignments of error 8, 100, and 101, Muhammad argues that the Commonwealth violated principles of due process "by simultaneously taking materially inconsistent positions in the Muhammad case, where it claimed Muhammad directed and controlled Malvo, and in the Malvo case where it claimed that Malvo was a free agent."  Muhammad further argues that the Commonwealth should be judicially estopped from maintaining prosecution theories in two cases based upon the same evidence because the theories of prosecution are "inconsistent" and "irreconcilable."  We need not address the legal arguments advanced by Muhammad because we hold that the theories of prosecution by the two independent prosecutors were not inconsistent.

41

Malvo sought to prove in his case in Fairfax County that he was insane or "brainwashed" by Muhammad. Evidence was successfully offered to rebut such claims. In the Fairfax County prosecution, the Commonwealth offered expert testimony that Malvo was "fully cognizant, conscious, deliberate, [and] purposeful." The Commonwealth argued in Malvo's case that he was a "bright, clever human being" who knew what he was doing when he acted in concert with Muhammad. In the Prince William County case against Muhammad, the Commonwealth presented evidence that Muhammad was the "leader" and "teacher" who trained and directed Malvo to perfect his sniper skills. A successful rebuttal of Malvo's affirmative defense of insanity is not inconsistent with a theory of prosecution that includes Muhammad engaged in training and directing Malvo in their sniper team activity. It is beyond peradventure that businesses, sports teams, and military operations involve training and direction without insanity of the participants as an issue. The trial court did not err in rejecting Muhammad's claim of inconsistent theories of prosecution.

### III. Indictment and Grand Jury Process

Muhammad asserts in multiple assignments of error that often overlap that there were fatal flaws in the indictment process. (Assignments of Error 4, 6, 7, 9, 10, 14, 15, 17, 18, 19, 27). We will consider them topically.

## A. Alleged Failure to Accuse Muhammad as the "Triggerman"

Muhammad argues the Commonwealth failed to allege facts necessary for a death sentence in the indictment because it did not allege that he actually fired the shot that killed Dean Meyers.  He further alleges that it was error to deny his motion for a bill of particulars to accomplish this end.  Also, he argues that the Commonwealth's notice of intent to seek the death penalty does not cure this alleged legal flaw in the indictment.  Finally, he argues that the trial court should have dismissed the indictment for its failure to indict Muhammad for murder in the second degree rather than capital murder because of lack of allegations that he was the "triggerman."

These related allegations simply advance Muhammad's argument that upon the facts of this case, only the person who "pulls the trigger" is eligible for the death sentence under Virginia law.  As we have set forth, an immediate perpetrator of the act is eligible for the death sentence.  The trial court did not err in recognizing this principle of law in its rulings on these motions.

## B.  Failure to State Aggravating Factors in the Indictment

Muhammad alleges that the capital murder indictments are defective because they failed to recite aggravating factors

43

that would support a death sentence. He argues that pursuant to Ring v. Arizona, 536 U.S. 584 (2002), aggravating factors in support of the death penalty are the functional equivalent of elements of the offense of capital murder. He further alleges that it was error to refuse his request for a bill of particulars specifying the aggravating factors upon which the Commonwealth would rely. Finally, despite the fact that the Commonwealth filed a notice of intent to seek the death penalty based upon both aggravating factors of vileness and future dangerousness, he argues that the Commonwealth's notice did not cure the defect in the indictments.

Ring involved the statutory sentencing scheme in Arizona where a death sentence may not legally be imposed unless at least one aggravating factor is found to exist beyond a reasonable doubt. Ring, 536 U.S. at 596. Additionally, the Arizona statutes provided that the judge, without a jury, was to make this determination. Id. at 592-93. The issue before the Supreme Court of the United States was stated as follows, "The question presented is whether that aggravating factor may be found by the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee, made applicable to the States by the Fourteenth Amendment, requires that the aggravating factor determination be entrusted to the jury." Id. at 597. Citing the Court's prior opinion in Apprendi v.

44

New Jersey, 530 U.S. 466 (2000), the precise answer was provided: "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' Apprendi, 530 U.S. at 494, n.19, the Sixth Amendment requires that they be found by a jury." Ring, 536 U.S. at 609.

The Virginia statutory scheme does not suffer from the infirmities found in Apprendi and Ring. In Virginia, if the defendant elects a jury trial, the existence of one or both aggravating factors of vileness or future dangerousness is submitted to a jury. Muhammad recognizes that Virginia's statutory scheme provides for jury determination of aggravating factors; however, he argues that the indictments in his case were defective for failure to set out the aggravating factors upon which the Commonwealth would seek the death penalty.

In Jones v. United States, 526 U.S. 227 (1999), the Supreme Court reviewed a conviction under a federal statute prosecuted in federal court. The Court stated, "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." Id. at 243, n.6. The

45

Court in Apprendi quoted this statement and added, "The Fourteenth Amendment commands the same answer in this case involving a state statute."  Apprendi, 530 U.S. at 476. However, in a footnote to the opinion, the Court stated,

> Apprendi has not here asserted a constitutional claim based on the omission of any reference to sentence enhancement or racial bias in the indictment.  He relies entirely on the fact that the "due process of law" that the Fourteenth Amendment requires the States to provide to persons accused of crime encompasses the right to a trial by jury . . . and the right to have every element of the offense proved beyond a reasonable doubt . . . .  That Amendment has not, however, been construed to include the Fifth Amendment right to "presentment or indictment of a Grand Jury" that was implicated in our recent decision in Almendarez-Torres v. United States, 523 U.S. 224 (1998).  We thus do not address the indictment question separately today.

Apprendi, 530 at 477, n.3.  As if to emphasize the point, the Court stated in a footnote to Ring,

> Ring does not contend that his indictment was constitutionally defective.  See Apprendi, 530 U.S. at 477, n.3 (Fourteenth Amendment "has not . . . been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury' ").

Ring, 536 U.S. at 597, n.4.

Muhammad concedes in his brief, "[w]e have acknowledged that states are currently not bound by the federal constitution to proceed in felony cases by way of indictment." He then makes the argument that is now before this Court:

46

"Nevertheless, having chosen to establish a grand jury system in Virginia, there is a federal due process right that demands the state properly follow that scheme."  We disagree with Muhammad.  A similar argument was made and rejected in Pennsylvania v. Finley, 481 U.S. 551 (1987).  In Finley, Pennsylvania provided court appointed counsel for collateral attacks upon conviction, a right not required by the Constitution of the United States.  The Court held that Finley could not sustain a federal constitutional claim for deficient performance of counsel in such collateral proceedings where there was no federal constitutional right to counsel in the first place.  Id. at 558-59.  Similarly, Muhammad has no constitutional claim for failure to include aggravating factors in the two capital murder indictments because proceeding by indictment is not constitutionally required of the states.

Additionally, in Virginia, if the indictment gives a defendant sufficient notice of the nature and character of the offense charged so he can make his defense, no bill of particulars is required.  Roach v. Commonwealth, 251 Va. 324, 340, 468 S.E.2d 98, 107, cert. denied, 519 U.S. 951 (1996), Wilder v. Commonwealth, 217 Va. 145, 147, 225 S.E.2d 411, 413 (1976).  In Goins v. Commonwealth, 251 Va. 442, 454, 470 S.E.2d 114, 123, cert. denied, 519 U.S. 887 (1996), we held

that an indictment reciting an offense under Code § 18.2-31

was sufficient to place the defendant on notice of the nature

and character of the offense charged.  We noted that:

> The capital murder indictment alleged that "on
> or about October 14, 1994, in the City of
> Richmond, Christopher Cornelius Goins did
> feloniously and unlawfully commit capital
> murder in that he did kill and murder Robert
> Jones in a willful, deliberate and
> premeditated killing of more than one person
> as part of the same act or transaction."

Id. at 454 n.1, 470 S.E.2d at 123 n.1.  We held that the

indictment in Goins was sufficient.  Muhammad's indictments

were sufficient as well.

A defendant is not entitled to a bill of particulars as a

matter of right.  Code § 19.2-230 provides that a trial court

"may direct the filing of a bill of particulars."  The trial

court's decision whether to require the Commonwealth to file a

bill of particulars is a matter committed to its sound

discretion.  Quesinberry v. Commonwealth, 241 Va. 364, 372,

402 S.E.2d 218, 223, cert. denied, 502 U.S. 834 (1991).  Here,

the trial court denied Muhammad's motion for a bill of

particulars identifying the aggravating factors upon which the

Commonwealth would rely.  After the trial court denied the

bill of particulars, the Commonwealth nonetheless filed a

notice of intent to seek the death penalty which fully placed

Muhammad on notice that the Commonwealth intended to prove both future dangerousness and vileness as aggravating factors.

We hold that aggravating factors are not constitutionally required to be recited in a capital murder indictment. We hold that the indictments in this case were sufficient under Virginia law. We hold that the purported violation of Virginia's indictment provisions in this case does not rise to the level of a federal constitutional claim. We hold that it was not an abuse of discretion to refuse Muhammad's motion for a bill of particulars. Finally, we hold that any error that could have been committed by the failure to order a bill of particulars was rendered harmless by the provision of the information Muhammad sought in the Commonwealth's notice of intent to seek the death penalty.

### C. Alleged Defect in Indictment Because of Disjunctive Language

In assignment of error 15, Muhammad asserts that the indictment charging capital murder under the terrorism predicate is defective because of the use of disjunctive terms. The indictment in question follows the language of Code § 18.2-46.4 which states in pertinent part:

> "Act of terrorism" means an act of violence as defined in clause (i) of subdivision A of § 19.2-297.1 committed with the intent to (i) intimidate the civilian population at large; or (ii) influence the conduct or activities of

the government of the United States, a state
or locality through intimidation.

Code § 18.2-46.4 (emphasis added).  Muhammad claims that the

indictment is defective because it did not specify which of

the two intents Muhammad had at the time of the killing.  His

argument is not based upon any constitutional claims; rather,

his argument is confined to state law issues.

The indictment charges a single offense and not two

separate offenses.  The single offense can be satisfied upon

proof of either or both of two mens rea conditions.  A

reasonable construction of the indictment as rendered by the

grand jury includes both.  Here, the trial court permitted the

amendment of the indictment to more particularly express what

was already a reasonable construction of the meaning of the

indictment as delivered.  The indictment was amended from "or"

to "and/or."

Previously, we considered a similar claim of defective

indictment based upon the use of the disjunctive, "or."  In

Buchanan v. Commonwealth, 238 Va. 389, 398, 384 S.E.2d 757,

763 (1989), cert. denied, 493 U.S. 1063 (1990), the defendant

was charged with capital murder based upon the killing of more

than one person as a part of the same act or transaction.

Buchanan killed four people. We observed that:

The first indictment charged, in essence, that
Buchanan killed Buchanan, Sr. as part of the

50

same act or transaction in which he killed
J.J., Donnie, or, Mrs. Buchanan.

238 Va. at 396, 384 S.E.2d at 762.  We held that this
indictment reasonably placed Buchanan on notice in the
following manner:

> Under the first indictment, Buchanan was on
> notice that he had to defend against a claim
> that he killed Buchanan, Sr. and *all three* of
> the other victims as part of the same act or
> transaction; that he killed Buchanan, Sr. and
> *any two* of the other victims as part of the
> same act or transaction; or that he killed
> Buchanan, Sr. and *any one* of the other victims
> as part of the same act or transaction.

Id. at 397, 384 S.E.2d at 762.

Muhammad had notice in the indictment, as originally
found by the grand jury and as amended, that he was charged
with a single offense that could be proved by showing: (1) his
intent to intimidate the civilian population at large, or (2)
his intent to influence the conduct or activities of the
government of the United States, a state or locality through
intimidation; or (3) his intent to do both 1 and 2 above.  The
trial court did not err in refusing to dismiss the terrorism
indictment.

### D.  Alleged Deficiencies in the Composition of the Grand Jury

Muhammad argues that the process utilized in his
indictment was fatally flawed because the grand jury that
indicted him was "improperly constituted in violation of

51

Virginia Law and [his] rights to due process and equal protection." Other than this conclusory statement and the further statement that the process is "arbitrary and vague," Muhammad makes no constitutional argument in his brief in support of his contentions. His argument is insufficient. Rule 5:17(c). Furthermore, no constitutional argument was raised in the trial court. Rule 5:25. We will not consider this vague and uncertain constitutional challenge to the composition of the grand jury.

Additionally, his statutory challenge is without merit. Code §§ 19.2-191 through -205 govern the selection of regular grand jurors. The record reveals that the grand jurors who returned indictments against Muhammad were selected pursuant to the following routine process. The clerk of the court creates a list of individuals who have been called to serve as petit jurors at least three times, but not in the immediately preceding three years. From that list, a smaller list of 120 names is created. The list of 120 names is reviewed by all the judges of the circuit. Questionnaires are sent to the persons on the list. At each term of court, seven jurors are randomly selected to serve as regular grand jurors. The chief judge of the circuit reviews the questionnaires prior to the first meeting of the grand jury. During his first meeting

with the grand jurors, the chief judge discusses their duties with them and selects one of them to be the foreperson.

The procedure employed in this case complies with the requirements outlined by statute that the grand jury be composed of "persons 18 years of age or over, of honesty, intelligence and good demeanor and suitable in all respects to serve as grand jurors," Code § 19.2-194, and "a citizen of this Commonwealth, eighteen years of age or over, and shall have been a resident of this Commonwealth one year and of the county or corporation in which the court is to be held six months, and is in other respects a qualified juror."  Code § 19.2-195.

Finally, Muhammad claims that the grand jurors "were not properly rotated as required by Section 19.2-194."  There is no evidence to support his claim.  The evidence does establish that this grand jury was sworn to sit for a two month term in October and November 2002.  We hold that the evidence does not sustain a claim that there were infirmities in the process, selection, or make-up of the grand jury that indicted Muhammad.

IV. Constitutional Challenge
to the Terrorism Statute

53

In assignment of error 17, Muhammad maintains that the terrorism statutes, Code §§ 18.2-31(13) and 18.2-46.4 are unconstitutionally overbroad and vague.  We disagree.

As the Supreme Court stated in Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489 (1982):

> In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.  If it does not, then the overbreadth challenge must fail.  The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications.  A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.  A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law.

Id. at 494-95.  See Chicago v. Morales, 527 U.S. 41, 52 (1999).  The First Amendment doctrine of overbreadth requires proof that a law "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.' "  Virginia v. Hicks, 539 U.S. 113, 118 (2003) (citing Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973)).  While Muhammad utilizes the term "overbroad," he offers no evidence or argument in support of the requirements

54

of this doctrine.  Instead, Muhammad confines his argument to vagueness.

A successful challenge to the facial validity of a criminal statute based upon vagueness requires proof that the statute fails to provide notice sufficient for ordinary people to understand what conduct it prohibits, or proof that the statute "may authorize and even encourage arbitrary and discriminatory enforcement."  Morales, 527 U.S. at 56; Kolender v. Lawson, 461 U.S. 352, 357 (1983).  But "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness."  Parker v. Levy, 417 U.S. 733, 756 (1974); Commonwealth v. Hicks, 267 Va. 573, 580-81, 596 S.E.2d 74, 78 (2004); accord Gibson v. Mayor of Wilmington, 355 F.3d 215, 225 (3d Cir. 2004); Fuller v. Decatur Public School Board of Education School District 61, 251 F.3d 662, 667 (7th Cir. 2001); Joel v. City of Orlando, 232 F.3d 1353, 1359-60 (11th Cir. 2000); United States v. Tidwell, 191 F.3d 976, 979 (9th Cir. 1999); United States v. Hill, 167 F.3d 1055, 1063-64 (6th Cir.), cert. denied, 528 U.S. 872 (1999); Woodis v. Westark Community College, 160 F.3d 435, 438-39 (8th Cir. 1998); United States v. Corrow, 119 F.3d 796, 803 (10th Cir. 1997), cert. denied, 522 U.S. 1133 (1998); Love v. Butler, 952 F.2d 10, 14 (1st Cir. 1991); Hastings v. Judicial Conference of the United States, 829 F.2d 91, 107 (D.C. Cir.

55

1987), cert. denied, 485 U.S. 1014 (1988); Hill v. City of Houston, 789 F.2d 1103, 1127 (5th Cir. 1986), aff'd, 482 U.S. 451 (1987); Gallaher v. City of Huntington, 759 F.2d 1155, 1160 (4th Cir. 1985).

Capital murder pursuant to Code § 18.2-31(13) is defined as the "willful, deliberate and premeditated killing of any person by another in the commission of or attempted commission of an act of terrorism as defined in Code § 18.2-46.4."

> "Act of terrorism" means an act of violence as
> defined in clause (i) of subdivision A of
> § 19.2-297.1 committed with the intent to (i)
> intimidate the civilian population at large;
> or (ii) influence the conduct or activities of
> the government of the United States, a state
> or locality through intimidation.

Code § 18.2-46.4. The "act of violence" reference to Code § 19.2-297.1 includes a list of certain specific aggravated felonies including murder, voluntary manslaughter, mob-related felonies, malicious assault or bodily wounding, robbery, carjacking, sexual assault and arson. The combination of these statutes defines criminal conduct that constitutes a willful, deliberate and premeditated killing in the commission, or attempted commission, of one of the designated felonies with the intent to intimidate the civilian population or influence the conduct of government through intimidation. Additionally, under Code § 18.2-18 the General Assembly extended the reach of criminal conduct subject to the death

penalty to include "a killing pursuant to the direction or order of one who is engaged in the commission of or attempted commission of an act of terrorism under the provisions of subdivision 13 of § 18.2-31."

Muhammad raises questions about the definition of "intimidation," "civilian population at large," and "influence the conduct or activities of government." He suggests that failure to statutorily define these phrases renders the statutes unconstitutional. He further complains that "no distinction can be drawn between the newly defined crime and any 'base offense' which carries with it the same hallmarks of intimidation and influence," and that this allows "unguided and unbridled law enforcement discretion." Muhammad further maintains that extending the scope of the statute to reach those who order or direct a killing in the commission of or attempted commission of an act of terrorism somehow violates what he calls the "triggerman rule." In a particularly exaggerated statement, Muhammad claims that extending the scope of the statute "allows almost any violent criminal act to be classified as terrorism and thereby rendering any individual charged eligible for the death penalty." We disagree with each of Muhammad's contentions.

By referencing established criminal offenses as acts of violence subject to the statutory scheme, the legislature

included offenses with previously defined elements and mens rea requirements. Additionally, the term "intimidate" has been defined by case law. See Sutton v. Commonwealth, 228 Va. 654, 663, 324 S.E.2d 665, 669 (1985) (defining intimidation as unlawful coercion; extortion; duress; putting in fear).

We have no difficulty understanding that "population at large" is a term that is intended to require a more pervasive intimidation of the community rather than a narrowly defined group of people. Examples are illustrative. When used in a descriptive sense referring to a prison, the prison "population at large" consists of everyone in the prison rather than a small subset of prisoners. Lewis v. Casey, 518 U.S. 343, 358 (1996); Cleavinger v. Saxner, 474 U.S. 193, 210 (1985). In a case involving the exclusion of certain people from capital juries, the term "population at large" meant the community from which the jury pool could be chosen. Lockhart v. McCree, 476 U.S. 162, 179 (1986). It is significant to note that Muhammad offered a similar understanding of the term when he argued below that all potential jurors in his case were victims. We do not believe that a person of ordinary intelligence would fail to understand this phrase.

Similarly, we do not believe that a person of ordinary intelligence needs further definition of the phrase "influence the conduct or activities of government." Muhammad's argument

on this point is essentially a strained "legislative history" argument. Quoting former Attorney General Jerry Kilgore's press releases, Muhammad claims that the statutes are designed "to address al-Qaeda type attacks – attacks motivated by a greater political purpose." Even if a press release could qualify as legislative history, it is quite a leap to impute, from the press releases of an Attorney General, the intent of the General Assembly. We find the intent of the General Assembly primarily in the words it employs in enacting legislation. Nothing in the words of these statutes evinces an intent to limit its application to criminal actors with political motives.

Muhammad maintains that there is no distinction between the "base offense" and the capital offense based upon terrorism. What he appears to be arguing is that the terrorism statute is unnecessary on the one hand because a killing in the commission of one of the enumerated violent acts could result in the death penalty anyway, and on the other hand, its reach is extended too far by including those who order or direct such killings. Clearly, the General Assembly has the power to define criminal conduct even if statutes overlap in coverage. Whether a defendant can be simultaneously or successively charged with overlapping offenses implicates other questions not presented here.

Muhammad's quarrel with the expansion of the potential imposition of the death penalty to those who order or direct another in a killing in the commission of or attempted commission of an act of terrorism is a policy question well within the purview of legislative power so long as it is not otherwise unconstitutional. In that respect, Muhammad argues in assignment of error 18 that the provisions of Code § 18.2-18 allow the death penalty for a defendant with no demonstrated intent to kill the victim. Muhammad incorrectly characterizes the extension of the scope of the statute to reach traditional "aiders and abettors." The provisions of Code § 18.2-18 do not extend to "aiders and abettors;" rather, it extends only to those who "direct" or "order" the killing. The criminal actor who "orders" or "directs" the killing is not unlike the criminal actor who hires another to kill and is potentially subject to the death penalty under Code § 18.2-31(2). The criminal actor who "orders" or "directs" the killing shares the intent to kill with the one who carries out the murder. The provisions of Code § 18.2-18 do not have the effect imagined by Muhammad.

Muhammad's argument concerning vagueness does not focus on his conduct. Indeed, Muhammad does not claim in his brief that his actions and those of Malvo were not acts of terrorism under the statutory provisions. Rather, Muhammad

hypothetically poses questions about the applicability of the statute in other circumstances.  As discussed above, the statutes provide notice sufficient for ordinary people to understand what conduct they prohibit, and do not authorize and/or encourage arbitrary and discriminatory enforcement. More importantly, Muhammad cannot and does not maintain that the statutes do not give him notice that his conduct and Malvo's conduct was prohibited.  Nor does Muhammad allege that he has been subject to arbitrary or discriminatory enforcement of the statutes.  One who engages in conduct that is clearly proscribed and not constitutionally protected may not successfully attack a statute as void for vagueness based upon hypothetical conduct of others.  Hoffman Estates, 455 U.S. at 494-95.

V.  Alleged Conflict Between Sentencing Provisions

Muhammad argues in assignment of error 27 that he may not be sentenced to death because of an "absolute and un-rectifiable conflict" between the capital murder statute (Code § 18.2-31(13)), and the terrorism statute (Code § 18.2-46.4, et seq.).  Capital murder is a Class 1 felony punished by life imprisonment or death.  The terrorism statute provides for a penalty as a Class 2 felony "if the base offense of such act of terrorism may be punished by life imprisonment, or a term of imprisonment of not less than twenty years."  Code § 18.2-

61

46.5.  Muhammad argues that there is "no discernable distinction whatsoever between murder committed under the terrorism provision and murder committed under the capital murder provision."  He maintains that he may not be subject to the greater punishment.

The Supreme Court of the United States resolved this same issue in a case involving sentencing provisions under two statutes that encompassed the same criminal act.  Holding that the prosecutor had discretion to choose which statute to base the prosecution upon, the Court stated:

> The provisions in issue here, however, unambiguously specify the activity proscribed and the penalties available upon conviction. That this particular conduct may violate both Titles does not detract from the notice afforded by each.  Although the statutes create uncertainty as to which crime may be charged and therefore what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments.  So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied.
>
> This Court has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants.

United States v. Batchelder, 442 U.S. 114, 123-24 (1979).  Muhammad makes no constitutional argument in his brief on this issue.  He merely recites that there is a conflict.  He does

62

not argue that there is ambiguity in either statute nor does he argue that application of the statute discriminates against any class of defendants. The trial court did not err in denying Muhammad's motion to preclude a death sentence on this basis.

## VI. Right to Self-Representation

Muhammad alleges in briefing assignment of error 35 that the trial court violated Muhammad's "Sixth Amendment right to self-representation by unduly interfering with his ability to consult with standby counsel."

The right of a criminal defendant to represent himself is found in the Sixth Amendment to the Constitution of the United States. Faretta v. California, 422 U.S. 806, 807, 836 (1975). The right is not without limitations and conditions. Only after the jury panel had been sworn, did Muhammad request permission to represent himself. At that time, Muhammad did not have a constitutional right to proceed pro se. As the United States Court of Appeals for the Fourth Circuit has held,

> we think it is reasonable, and entirely compatible with the defendant's constitutional rights, to require that the right of self-representation be asserted at some time "before meaningful trial proceedings have commenced," and that thereafter its exercise rests within the sound discretion of the trial court.

*United States v. Lawrence*, 605 F.2d 1321, 1325 (4th Cir. 1979), cert. denied, 444 U.S. 1084 (1980).  Nonetheless, after extensive questioning of Muhammad concerning his decision and appropriate admonition concerning the risks involved and the manner in which it would be permitted, the trial court exercised its discretion and allowed Muhammad to represent himself.  The trial court directed his lawyers to be "standby counsel."  The trial court informed Muhammad that "standby counsel" could sit at counsel table with him, and "you can perhaps upon occasion ask them questions, but I don't expect you to ask them every question that's being formulated.  That would, I think, unduly hinder the trial process."

After two days of self-representation, Muhammad changed his mind and requested that his "standby counsel" resume their previously assigned role.  Now Muhammad complains about the limitations and restrictions placed upon him during those two days.  The only issue presented in this assignment of error is stated by Muhammad as follows: "whether the court improperly prohibited Muhammad from consulting with his standby counsel."

Soon after Muhammad began representing himself, the Commonwealth objected to the extensive interaction between Muhammad and standby counsel.  The Commonwealth complained that standby counsel was actually acting as co-counsel in contravention of the trial court's instructions.  An exchange

between the trial court and standby counsel appears to confirm the Commonwealth's concern. Standby counsel stated:

> Mr. Muhammad has asked about things such as objections – what is hearsay? What is a leading question? and so on. And so he's inquired about that and the timing of objections and so on, which as the court knows is obviously crucial or else it's waived. That's the context of it. We'd say hearsay, and he knew the argument to make to Your Honor and same thing as far as leading questions.

It is apparent from this exchange that standby counsel was doing far more than responding to inquiries made by Muhammad. Rather, as they admit, they were prompting him to make objections during the course of testimony.

The trial court indicated that Muhammad would not be permitted to have "hybrid" representation where standby counsel becomes co-counsel by extensive participation and direction of the defense. "Faretta does not require a trial judge to permit 'hybrid' representation." McKaskle v. Wiggins, 465 U.S. 168, 183 (1984). As Muhammad acknowledges in his brief, "[t]he court's solution to the perceived problem was to move standby counsel down the table, away from Mr. Muhammad, something that Mr. Muhammad had suggested." Muhammad does not now complain that he could not have taken an extra step or two to consult with counsel. He cannot be heard to complain of a solution he proposed. There is no specific ruling of the trial court that Muhammad identifies as error.

Muhammad points to no objection made by him concerning the trial court's direction or handling of the issue. The record reveals that Muhammad expressly agreed with the trial court's instructions to standby counsel. Upon review of the specific arguments made by Muhammad and the relevant portions of the record he identifies, we hold that the trial court did not abridge his rights under the Sixth Amendment to properly consult with standby counsel.

## VII. Refusal to Permit Expert Healthcare Testimony at Sentencing

The trial court granted Muhammad's motion under the provisions of Code § 19.2-264.3:1 for the appointment of mental health experts to assist him in his defense. Thereafter, Muhammad gave notice of his intent to use expert psychiatric testimony at the sentencing phase to prove mitigating factors. In response, the Commonwealth moved the trial court for an order appointing an expert for the Commonwealth pursuant to Code § 19.2-264.3:1(F).

At the hearing on the Commonwealth's motion for the appointment of an expert, the trial court granted Muhammad's request that the Commonwealth's expert be prohibited from inquiring into circumstances of the crimes alleged or Muhammad's relationship with Malvo. This restriction was based upon Muhammad's declaration that he did not intend to

66

present evidence that he acted under extreme mental disturbance or failed to appreciate the criminality of his conduct.  At that time, the trial court advised Muhammad that if he refused to cooperate with the Commonwealth's expert, it could result in the exclusion of Muhammad's expert's testimony.  Muhammad acknowledged to the trial court that he understood the requirements and the potential consequences for noncompliance.

Nonetheless, on October 8, 2003, Muhammad refused to be interviewed by the Commonwealth's expert without his counsel present.  Also, he objected to the expert's use of a video camera during the interview.  After a hearing on the matter, the trial court permitted counsel to be present at the interview by the Commonwealth's expert and further ruled that the interview could be recorded by video camera.  Nonetheless, the following day, Muhammad refused to meet with the Commonwealth's expert under any circumstances.

In response, the Commonwealth moved the trial court under the provisions of Code § 19.2-264.3:1 to prohibit Muhammad from presenting expert testimony from his court appointed experts at sentencing.  At the hearing, the trial court again directly addressed Muhammad concerning the potential effect of his refusal to cooperate with the Commonwealth's expert. Muhammad indicated that he understood and that he had made the

choice not to cooperate. The trial court exercised its discretion under the statute and barred Muhammad from presenting expert testimony from his court appointed experts regarding mitigating factors at the sentencing proceeding.

Despite the trial court's ruling, at the conclusion of the evidence in the guilt phase of the trial, Muhammad moved the trial court to permit him to present expert testimony from one of his court appointed mental health experts, Dr. Cunningham, in the sentencing phase. Muhammad represented that Dr. Cunningham would not testify based upon anything he learned from his examination; rather, he would testify based upon statistical analyses about prison populations. Apparently, this testimony would be offered as relevant to the question of Muhammad's future dangerousness. The Commonwealth objected, but the trial court overruled the Commonwealth's objection at that time and invited Muhammad to present Dr. Cunningham's testimony outside the presence of the jury for a determination of its admissibility. Muhammad did not do so.

After all of the evidence had been presented to the jury in the sentencing phase and after both sides rested their case, Muhammad announced that he would present a proffer from Dr. Cunningham. An affidavit from Dr. Cunningham was thereafter submitted to the trial court.

In assignments of error 29, 75, and 76, Muhammad attacks various rulings of the trial court on this matter. Muhammad argues that it was an abuse of discretion for the trial court to deny him the opportunity to present expert testimony. He further states, in conclusory fashion, that the denial violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. He further complains that he was not able to present lay testimony in mitigation. Finally, he argues that, because of the notice of intent to use expert testimony in a limited fashion, the Commonwealth was not entitled to an expert evaluation of Muhammad.

Considering the Commonwealth's right to an evaluation of Muhammad, the trial court found, and Muhammad agreed, that the issue of notice of use of evidence in a limited fashion was not raised before the trial court ruled on the matter. It was raised for the first time in post trial proceedings. The trial court ruled that it was waived. Objections must be stated with reasonable certainty at the time of the trial court's ruling in order to be preserved for appellate review. This objection will not be considered on appeal. Rule 5:25.

Consideration of Muhammad's arguments on these matters requires a clear understanding of what the trial court ruled concerning these issues. The trial court ruled that Muhammad could not present expert testimony on mitigation factors at

sentencing because of his refusal to abide by the trial court's order to submit to an evaluation by the Commonwealth. The trial court did not bar the presentation of non-expert testimony on this issue. Thereafter, Muhammad sought the ability to present limited expert testimony purporting not to be based upon expert interviews. The Commonwealth objected. The trial court overruled the Commonwealth's objection and gave Muhammad the opportunity to present evidence out of the presence of the jury that would allow the trial court to rule on its admissibility. Muhammad did not take advantage of this invitation. Only after all the evidence was presented at the sentencing phase and both parties rested their case did Muhammad offer an affidavit as a proffer of Dr. Cunningham's testimony. He may not be heard to complain about the exclusion of Dr. Cunningham's limited testimony when he did not give the trial court the contemporaneous opportunity to evaluate its admissibility. Rule 5:25.

Nothing in the trial court's ruling prohibited non-expert testimony on mitigating factors in the sentencing proceeding. Muhammad cites Lovitt v. Warden, 266 Va. 216, 257, 585 S.E.2d 801, 825-26 (2003), cert. denied, 541 U.S. 1006 (2004), and suggests that somehow that case further prohibits such testimony in the absence of expert testimony. Nothing in Lovitt suggests such a bar.

Considering the main thrust of Muhammad's argument, we turn our attention to the claim that the trial court abused its discretion, and that its decision barring expert testimony on mitigation factors and the statutes that permit such a decision are unconstitutional.  Muhammad makes no argument on brief that the statutes are overbroad or vague.  His only argument is that their application to him under these circumstances violated various constitutional rights.

The trial court provided Muhammad with the experts he requested at state expense.  The trial court granted Muhammad's request that his counsel be present during any evaluation by the Commonwealth.  The trial court engaged Muhammad directly in court on multiple occasions concerning the potential consequences of his failure to cooperate with the evaluation.  On these occasions, Muhammad affirmatively expressed his understanding and further acknowledged that he freely decided not to cooperate.  After the trial court made its ruling, it even considered permitting expert mitigation testimony not based upon his own expert's interview with him. Muhammad did not avail himself of the opportunity.

Muhammad is correct that limiting the evidence that a criminal defendant may present in his defense implicates numerous constitutional rights.  What Muhammad fails to appreciate is that he may, by his knowing and informed

decisions, waive such rights.  These rights may be as venerated as the right to a jury, the right to counsel, the right against self-incrimination, and the right to exclusion of evidence seized in an unconstitutional manner.  As the Supreme Court recently noted, "Waiver of the right to counsel, as of constitutional rights in the criminal process generally, must be a 'knowing, intelligent ac[t] done with sufficient awareness of the relevant circumstances.' "  Iowa v. Tovar, 541 U.S. 77, 80 (2004) (quoting Brady v. United States, 397 U.S. 742, 748 (1970)).  We have no difficulty including the right to present mitigating testimony within the panoply of constitutional rights that may be waived by the accused.

Upon review of the record, we agree with the trial court that Muhammad's decision not to cooperate was knowingly and intelligently made.  The real issue presented is whether the trial court's exercise of discretion was reasonable under the circumstances.

The detailed and balanced statutory scheme provided by Code § 19.2-264.3:1 anticipates decisions made by the accused and the Commonwealth regarding expert mental health evaluations and testimony regarding sentencing issues in a capital murder trial.  One of those circumstances arises when the defendant gives notice of intent to present certain types of testimony at sentencing.  In response, the Commonwealth may

request an evaluation of the defendant.  The statute explicitly provides that the trial court must "advise the defendant on the record in court that a refusal to cooperate with the Commonwealth's expert could result in exclusion of the defendant's expert evidence."  Code § 19.2-264.3:1(F)(1). The statute explicitly provides the remedy for lack of cooperation: "the court may admit evidence of such refusal or, in the discretion of the court, bar the defendant from presenting his expert evidence."  Code § 19.2-264.3:1(F)(2).

The Supreme Court has recognized that the prosecution has the right to a fair rebuttal of mental health evidence presented by the defendant.  In Buchanan v. Kentucky, 483 U.S. 402 (1987), the defendant challenged the introduction of evidence from a psychiatric report prepared upon joint motion of the defendant and the prosecution.  The Court stated, "if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested."  Id. at 422-23.

We agree with the Commonwealth's characterization of the circumstances presented on this question.  "By his own deliberate conduct, the defendant sought to gain an unfair benefit by obtaining an evaluation that the Commonwealth would be powerless to contest at trial either by meaningful cross-

73

examination or by presenting its own expert testimony.  The trial court's remedy thus was protective of the interests of all parties in a fair trial and was not punitive."  The trial court's ruling was not unreasonable, especially considering that it was willing to consider expert testimony from Dr. Cunningham not based upon interviews with Muhammad, but Muhammad did not avail himself of the opportunity.  We hold that the trial court did not abuse its discretion by excluding Muhammad's expert witness testimony concerning mitigation factors at sentencing.

## VIII.  Discovery Issues

In assignments of error 1, 2, 3, 22, 98, and 99, Muhammad attacks the constitutionality of criminal discovery rules in Virginia, specific rulings of the trial court regarding discovery, the refusal of the trial court to permit ex parte application for expert witness assistance, and the refusal to grant a new trial upon "after-discovered" evidence of an alleged exculpatory nature.  There is no merit to any of Muhammad's contentions.

Muhammad's claim that criminal discovery rules in Virginia are unconstitutional because they provide for limited discovery, has been previously decided.  Bailey v. Commonwealth, 259 Va. 723, 736, 529 S.E.2d 570, 577, cert. denied, 531 U.S. 995 (2000); Walker v. Commonwealth, 258 Va.

74

54, 63, 515 S.E.2d 565, 570-71 (1999), cert. denied, 528 U.S. 1125 (2000). We see no reason to revisit this issue.

Additionally, the trial court did not err in denying certain specific requests for discovery:

a.   The trial court was correct in denying Muhammad's request 1(b) seeking "the specific questions, comments or statements of any person involved in the conversation with, or interrogation of, John Allen Muhammad, which brought about any response." Rule 3A:11 requires production of the substance of the defendant's statements but does not require production of the statements sought by Muhammad in this request. Nonetheless, the trial court did order that if a video, audio, or otherwise transcribed interrogation existed, the entirety of such material would be provided to the defendant.

b.   The trial court was correct in denying Muhammad's request for "any contemporaneously made notes of statements attributed to the defendant." Except for specifically designated items, subsection (b) of the Rule 3A:11 excludes the production of such notes.

c.   The trial court did not err in denying Muhammad's discovery request seeking "charged offenses, investigation or [items] which allege unadjudicated conduct." Such items are not discoverable under Rule 3A:11; rather such information and items may be provided by motion under Code § 19.2-264.3:2. Similarly, Muhammad's request for evidence of unadjudicated criminal conduct in request 8 was properly denied under Rule 3A:11.

Muhammad alleges that it was error for the trial court to refuse to permit him to make ex parte application to the court "in order to seek funds and authorization to retain expert evaluations." We have previously rejected this argument and find no reason to revisit the issue. Weeks v. Commonwealth, 248 Va. 460, 473, 450 S.E.2d 379, 388 (1994), cert. denied,

75

516 U.S. 829 (1995); Ramdass v. Commonwealth, 246 Va. 413, 422, 437 S.E.2d 566, 571 (1993), vacated on other grounds, 512 U.S. 1217 (1994).

The final issue related to discovery questions involves Muhammad's assertion that the trial court erred in failing to grant him a new trial because the Commonwealth allegedly failed to provide exculpatory evidence to him pursuant to Brady v. Maryland, 373 U.S. 83, 87 (1963). Malvo wrote certain letters from jail addressed to "Pacman," a person who remains unidentified. Counsel for Muhammad state that they first became aware of the existence of these letters when they were the subject of testimony in Malvo's trial. The Commonwealth represented to the trial court that prosecutors in Muhammad's case were unaware of the letters before the post-trial motion for a new trial was filed.

Muhammad claims that the so-called "Pacman letters" are exculpatory in nature because of the issue raised by Code § 18.2-18, previously discussed herein, extending the potential applicability of the death sentence in a capital murder prosecution under the terrorism statute where there is proof that the accused "directed" or "ordered" the killing. Muhammad maintains that the letters show the independence of Malvo from him and demonstrate that Malvo could not have acted under Muhammad's "direction" or "order."

We have previously stated:

> In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. Whether evidence is material and exculpatory and, therefore, subject to disclosure under Brady is a decision left to the prosecution. Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987). Inherent in making this decision is the possibility that the prosecution will mischaracterize evidence, albeit in good faith, and withhold material exculpatory evidence which the defendant is entitled to have under the dictates of Brady. If the defendant does not receive such evidence, or if the defendant learns of the evidence at a point in the proceedings when he cannot effectively use it, his due process rights as enunciated in Brady are violated. United States v. Russell, 971 F.2d 1098 (4th Cir. 1992); United States v. Shifflett, 798 F. Supp. 354 (1992); Read v. Virginia State Bar, 233 Va. 560, 564-65, 357 S.E.2d 544, 546-47 (1987).
>
> . . . .
>
> Exculpatory evidence is material if there is a reasonable probability that the outcome of the proceeding would have been different had the evidence been disclosed to the defense. "A reasonable probability" is one which is sufficient to undermine confidence in the outcome of the proceeding. United States v. Bagley, 473 U.S. 667, 682 (1985); Robinson v. Commonwealth, 231 Va. 142, 151, 341 S.E.2d 159, 164 (1986).

Bowman v. Commonwealth, 248 Va. 130, 133, 445 S.E.2d 110, 111-12 (1994).

77

We need not resolve questions related to when the Commonwealth knew of the letters or whether the knowledge of Fairfax prosecutors should be imputed to Prince William prosecutors because, upon review of the record, we hold that the letters were not exculpatory in nature, were not likely to be admissible in Muhammad's case, were cumulative of other testimony, and the admission of such letters would not result in a "reasonable probability that the outcome of the proceeding would have been different had the evidence been disclosed to the defense."

The letters do not significantly address the relationship between Malvo and Muhammad.  They do suggest the ability of Malvo to think and act independently, a subject squarely at issue in Malvo's case because Malvo maintained that he was "brainwashed" by Muhammad.  As previously discussed herein, Malvo's claim of insanity was demonstrably different than the issue of his action under "direction" or "order" of Muhammad.

Also, the ability of Malvo to think and act independently was amply revealed in other discovery given to Muhammad, such as transcripts of Malvo's confessions to police and drawings and writings Malvo made while in custody.  In this respect the "Pacman letters" are merely cumulative in nature.

Muhammad argues that the result of the trial would have been different had the jury received the letters in evidence.

The admissibility of the letters in Muhammad's case is far from established. Muhammad only states that they were admissible in Malvo's case, so they must be admissible in Muhammad's. However, in Malvo's case the letters may have satisfied an exception to the hearsay rule as statements of the defendant. Muhammad offers no theory of admissibility of this evidence in his trial that would overcome a hearsay objection.

In ruling on the motion for a new trial, the trial court stated:

> And I do not believe that the Pacman letters are such as to require the granting of a new trial.
> I believe that they are cumulative, corroborative and collateral . . . they are not material, such that they would not produce an opposite result on the merits at another trial, or, in the other analysis, that they are not favorable evidence that could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

Upon review of the record, we agree with the trial court. The trial court did not err in denying Muhammad's motion for a new trial based upon the "Pacman letters."

## IX. Jury Selection Issues

In assignments of error 16, 20, 30, and 31, Muhammad complains of error in the jury selection process. As a preliminary matter, he asserts that he cannot be tried by any

79

jury in the United States for capital murder under the terrorism statute.  He asserts that this unique charge alleging "intent to . . . intimidate the civilian population at large" results in the "legal impossibility to impanel an impartial jury."  His logic is simply stated: because victims of the crime charged cannot be jurors in the case, no one from the "civilian population at large" can serve on his jury.  Taking this tautology to its extreme application, Muhammad concludes, "The entire civilian population of Prince William County, and indeed, of the entire state and the United States, was alleged to be the victim."

We need not address Muhammad's extensive citation of cases concerning prohibition of victims of a particular crime serving on the jury trying the crime at issue.  The entirety of his argument is premised upon the status of jurors in this case as victims.  They are not victims.  The victim in the capital murder charge based upon terrorism is Dean Meyers.  Arguably, Muhammad's victims under the facts of the case and the evidence presented also included Keenya Cook, Muhammad Rashid, Paul LaRuffa, Claudine Parker, Keely Adams, Hong Im Ballenger, Premkumar Walekar, Sara Ramos, Lori Lewis-Rivera, Paschal Charlot, Caroline Seawell, Iran Brown, Kenneth Bridges, Linda Franklin, Jeffrey Hopper, and Conrad Johnson.

The trial court's task was to empanel an impartial jury. This task was accomplished by the application of the requirements of carefully drafted statutes in Virginia and the use of voir dire in the selection of the panel. The trial court did not err in denying Muhammad's motion to dismiss the indictment because of a "legal impossibility" of empanelling a jury on the capital murder charge based upon terrorism.

With regard to the voir dire process itself, Muhammad maintains that the trial Court erred in precluding counsel from propounding certain questions and "limiting voir dire . . . regarding capital punishment attitudes, pre-trial publicity and other issues." Additionally, Muhammad makes general arguments attacking the process of "death qualification" of jurors.

In his brief, Muhammad does not argue that the trial court abused its discretion in refusing any question he proposed. In fact, Muhammad does not identify any voir dire question he was not permitted to ask. In this respect, his assignments of error on these issues are inadequately supported by argument on brief and are waived. Rule 5:17(c); Powell, 267 Va. at 135, 590 S.E.2d at 554. Muhammad does specifically complain in assignment of error 32 that the court erred in permitting the Commonwealth to question jurors during voir dire concerning the "concept of direction or order of a

42 year old over a 17 year old regarding the terrorism theory." His argument consists of one sentence: "the Commonwealth should not have been able to telegraph its theory of direction or order." This single sentence does not constitute sufficient argument. The remainder of the specific complaints in assignment of error 32 are not mentioned at all in the argument. Consequently, they are deemed waived. Rule 5:17(c); Powell, 267 Va. at 135, 590 S.E.2d at 554.

Finally, with regard to the qualification of the jury, Muhammad argues that the "death qualification" process itself is unconstitutional. There is no assignment of error concerning this issue; consequently, it is not properly before us. Rule 5:17(c); Powell, 267 Va. at 135, 590 S.E.2d at 554.

## X. Evidentiary Issues

### A. Sergeant Major Mark Spicer

In assignments of error 36, 37, and 62, Muhammad alleges that it was error for the trial court to permit the testimony of Sergeant Major Mark Spicer concerning the Commonwealth's sniper theory. Spicer's testimony came at a time in the trial proceedings when Muhammad was representing himself with the aid of standby counsel.

Muhammad maintains that the Commonwealth did not identify Spicer as an expert witness pursuant to the requirements of a pretrial order. He further argues that the "slides" used as

demonstrative aids in his presentation constituted "reports" subject to disclosure under the pretrial order.  The pertinent part of the pretrial order required the Commonwealth's production of "written reports of autopsies, ballistic tests, fingerprint analysis, handwriting analysis, blood, urine and breath tests and other written scientific reports and . . . oral scientific reports that the Commonwealth intends to offer in its case in chief or that are exculpatory."  In consideration of Muhammad's motion for a new trial, the trial court held that the pretrial order did not require disclosure of all experts.  It only required the disclosure of scientific tests and results.  Spicer's slides were not in the nature of scientific tests and results.

Next, Muhammad asserts that Spicer's testimony was irrelevant and that he should not have been permitted to testify about "Mr. Muhammad's background, military career, and other factors not in evidence."  Upon review of the record, we hold that Muhammad did not make contemporaneous objections concerning these matters; consequently, they are not preserved for appeal and may not be considered.  Rule 5:25.  The trial court did not err in refusing to exclude Spicer from testifying or in refusing to grant Muhammad's motion for a new trial on these grounds.

B.   Jeffrey Miller

83

Muhammad alleges in assignment of error 44 that the trial court erred in permitting Fairfax Police Officer Jeffrey Miller to "testify as to his opinion." In argument, Muhammad maintains that Miller's testimony was expert opinion testimony and that it was based upon conjecture and surmise and facts not in evidence. Muhammad appears to complain in his brief, although not in the assignment of error, that he was not given notice of Miller's testimony in violation of the pretrial discovery order.

Muhammad did not object at trial on the basis that he had no notice of Miller's testimony. He did not object at trial that Miller's testimony was based upon conjecture or surmise or not supported by facts in evidence. He did not object at trial that Miller's testimony was expert in nature. We will not consider these arguments for the first time on appeal. Rule 5:25.

### C. Edward Bender

In assignment of error 54, Muhammad argues that the trial court erred in admitting certain laboratory reports of the Virginia Department of Forensic Science through Edward Bender, a chemist at the Federal Bureau of Alcohol, Tobacco and Firearms. His assignment of error asserts that admission of the report constituted a "violation of a right to confront the

person who undertook that analysis pursuant to <u>Crawford v. Washington</u>," 541 U.S. 36 (2004).

<u>Crawford</u> had not been decided at the time of Muhammad's trial. No objection was made at trial based upon Sixth Amendment rights. Muhammad's objections were based upon compliance with Code § 19.2-187 not constitutional concerns. The objections on appeal based upon the Sixth Amendment and <u>Crawford</u> were not preserved at trial. We will not consider them. Rule 5:25.

### D. Professor Steven Fuller

George Mason University Professor Steven Fuller testified over the defendant's objection about the economic impact of the 47 days of turmoil caused by the criminal conduct of Muhammad and Malvo. Assignment of error 60 complains that his testimony was permitted without notice required by the pretrial discovery order, "and further was without proper foundation or a basis in the record for such expert testimony to be admitted."

The trial court found that Fuller did not generate any reports which were required to be produced by the pretrial discovery order. Although Muhammad claims in his brief that "the testimony was wholly irrelevant," he also answers his own objection by stating, "[t]his witness was crucial to the Commonwealth theory that the October, [2002] shooting

85

influenced the government."  Other than relevance, an issue he concedes, Muhammad does not offer any specific basis upon which this testimony was admitted without proper foundation. Upon review of the record, we cannot say that the trial court abused its discretion in permitting Fuller to testify.

E.  Alleged Victim Impact Evidence
Admitted During Guilt Phase

In assignments of error 38, 39, 40, 41, and 42, Muhammad makes various objections to the introduction of biographical information and backgrounds of various victims.  Specifically, Muhammad objects to the trial court's admission of "so-called 'photographs in life'" of various shooting victims and the admission of certain "911" calls, particularly that of Ted Franklin, husband of Linda Franklin.

At trial, Muhammad did not object to the admission of the "photographs in life" of various victims.  He did raise an objection to the Commonwealth's use of the photographs during opening statement, but did not object to the photographs when admitted.  Also Muhammad did not object to the admission of the first three "911" tapes received in evidence regarding the shooting of Meyers and LaRuffa.  These objections are not preserved.  Rule 5:25.

Three other "911" tapes were admitted into evidence. Muhammad objected to the tape related to Rashid's shooting as

86

"irrelevant."  With regard to the tapes involving the shootings of Brown and Franklin, Muhammad objected that the tapes were irrelevant and cumulative.  The trial court ruled that the tapes were "very relevant . . . and material evidence."  Muhammad objected to the "911" tape of Franklin's husband as prejudicial.  Upon consideration of the objection, the trial court ruled that the prejudicial impact was outweighed by its probative value.  The trial court specifically noted that the tape was relevant to the issue of terror in the community.

Muhammad objected to a question asked of Meyers' brother regarding Meyers' military service.  The trial court sustained the objection.  Every objection made by Muhammad to the testimony of Parker's sister was sustained.  Muhammad did not make a contemporaneous objection to the testimony of Ballenger's sister; rather, he waited until her testimony was concluded.  Any objection not raised contemporaneously is waived.  Rule 5:25.  To the extent that a continuing or renewed objection was made to the introduction of a photograph of Ballenger, the trial court did not err in admitting Exhibit 137A.  Similarly, Muhammad's objection to the testimony of Ballenger's widower was not timely.  An objection during the testimony of Walekar's daughter resulted in a direction from the trial court to limit the testimony to biographical

information.  The objection made by Muhammad to the testimony of Ramos' widower was sustained.  Before Lewis-Rivera's widower testified, Muhammad objected to what he expected to be "victim-impact" testimony.  The court instructed the Commonwealth concerning proper limitations upon the testimony and, when it was offered, there was no objection.  Every objection to the testimony of Charlot's daughter, Franklin's daughter, and Johnson's widow was sustained.

The record reveals that the trial court carefully limited the Commonwealth in the guilt phase to short biographical information about the victim and the manner in which the particular family member found out about the shooting.  The testimony was not "victim-impact" testimony allowed in the penalty phase.  It did not consist of evidence of economic or psychological loss, or grief.  The trial court did not abuse its discretion in the admission of such evidence.

### F.  The Rashid Shooting

Muhammad alleges in assignment of error 46 that evidence of the robbery and shooting of Muhammad Rashid was immaterial and irrelevant to the Commonwealth's theories of the case.  He also argues that the probative value of the evidence was outweighed by the prejudicial impact upon the jury.

At trial the Commonwealth explained the relevance of the evidence.  Rashid was shot and wounded at the Three Roads

Liquor Store.  Rashid saw the Caprice outside the store before the shooting.  He identified Malvo as the person who shot him with a handgun.  At the same time that Malvo shot him, he was shot at with a rifle from a distance.  The rifle shot missed its target.  The handgun was the same weapon used to shoot and wound LaRuffa and the same weapon found at the scene in Montgomery, Alabama where Malvo dropped it after Parker and Adams had been shot with a high-powered rifle.  The rifle used to wound and kill Parker and Adams at the same time that Malvo held the handgun during their robberies was the .223 caliber Bushmaster rifle recovered from the Caprice with Muhammad and Malvo.

The trial court did not abuse its discretion in the admission of this evidence because it demonstrated a "singular strong resemblance to the pattern of the offense charged," Johnson v. Commonwealth, 259 Va. 654, 677, 529 S.E.2d 769, 782, cert. denied, 531 U.S. 981 (2000), and it provided significant links connecting Muhammad and Malvo to each other, to the weapons used, and supported the theories of the Commonwealth concerning the methodology of their cooperative criminal efforts.

G.  Documents Related to the Caprice

During the testimony of Christopher O'Kupski, a used car salesman from New Jersey, the trial court admitted certain

"paperwork" related to the ownership and transfer of title for the Caprice. In assignment of error 48, Muhammad argues that the trial court erred in admitting these documents because they were "not properly authenticated" and "were hearsay." Exhibit 65 consisted of four documents: the temporary car tag, a registration application, a reassignment form, and the original title to the Caprice. Upon questioning by the trial court, the witness stated that he had "filled out" the documents, with the exception of the registration application which is a form regularly used by the New Jersey Division of Motor Vehicles. Assuming, without deciding that the admission of any or all of these documents was improper, the error would be harmless. The evidence was offered to show Muhammad's purchase of and connection to the Caprice. Considering O'Kupski's testimony apart from the documents themselves, and the extensive evidence of Muhammad's connection to the Caprice, if the trial court erred, such error was most certainly harmless error.

## H.  Charlene Anderson

Charlene Anderson, Muhammad's cousin, testified about her encounters with Muhammad and Malvo in Baton Rouge, Louisiana in August 2002. In assignments of error 49, 50, 51, and 62, Muhammad asserts that her testimony was irrelevant, that "the prejudicial value outweighed any probative assistance to the

90

fact finder," and that the Commonwealth was permitted to question Anderson on redirect beyond the scope of cross-examination.

Anderson testified that Muhammad told her that he and Malvo were on a mission for the military to recover explosives. Anderson was a law enforcement officer. Muhammad asked her to provide him with bullets. Anderson testified that Muhammad told her that Malvo was "highly trained."

Muhammad objected to this testimony on the grounds that it was hearsay and irrelevant. The trial court overruled the objection on the grounds that it was not offered for the truth of its content, namely that Muhammad and Malvo were actually on a mission for the military and that Malvo actually was "highly trained." The purpose for the testimony was to show Muhammad's attempt to obtain ammunition for his rifle shortly before the string of shootings began and also to show the nature of the relationship between Malvo and Muhammad.

During cross-examination of Anderson, Muhammad elicited testimony suggesting that Muhammad and Malvo did not interact or talk to each other. On redirect, the trial court permitted the Commonwealth to ask Anderson about a conversation she overheard between Muhammad and Malvo.

Lastly, with respect to Anderson's testimony, Muhammad asserts that it was error to permit Anderson to describe the

rifle Muhammad showed her.  Muhammad made no such objection at trial.  He may not advance this claim of error for the first time on appeal.  Rule 5:25.

Upon review of the record and upon the issues preserved for appeal, we hold that the trial court did not err in admitting Anderson's testimony.  It was relevant and its probative value outweighed any claim of prejudicial effect upon the jury.

### I.  Demonstrative Evidence – Model
### of the Caprice Trunk and Video

At trial the Commonwealth offered demonstrative evidence utilizing a model of the trunk of the Caprice and a video demonstrating how a shooting could take place from the trunk. The use of demonstrative evidence to illustrate testimony is a matter entrusted to the sound discretion of the trial court. Mackall v. Commonwealth, 236 Va. 240, 254, 372 S.E.2d 759, 768 (1988), cert. denied, 492 U.S. 925 (1989).

Muhammad claims in assignments of error 55, 56, 57, and 58 that the trial court erred in admitting this evidence because "the reconstruction was not complete," it "was out of context," and "did not include the materials in the trunk from the time of Mr. Muhammad's arrest or any specific incident." Muhammad further argues that it was error to allow the jury to inspect the Caprice after viewing the demonstrative replica

92

and the video.  He further complains about the use of "police officer stand-ins" in the video and that the evidence presented invited the jury to speculate about what occurred in the shootings, particularly the shooting of Dean Meyers.

The evidence presented was not expert reconstructive opinion testimony.  Rather it was demonstrative evidence, illustrative in nature of other evidence presented.  Muhammad claims that the demonstration was not supportive of the Commonwealth's theory of the case nor based upon other evidence presented.  We disagree with Muhammad.

Scientific evidence of the presence of nitroglycerine and gunshot residue in the trunk of the Caprice proved that gunshots were fired from the trunk.  A witness testified that he saw a flash come from the car when Charlot was murdered.  Muhammad and Malvo were seen in the Caprice immediately before the murder of Dean Meyers.  Immediately after the murder of Dean Meyers, Muhammad was interviewed in the parking lot across the street and in the presence of the Caprice.  Malvo was not seen at the parking lot, leaving the reasonable inference that Malvo was in the trunk.  Demonstrative evidence concerning how a person could get from the passenger compartment to the trunk from the inside and how a person could shoot a rifle from within the trunk was relevant and helpful to the jury.

93

The trial court carefully considered the relevance of the demonstrative evidence and the foundation for its admissibility. The trial court did not abuse its discretion in permitting this demonstrative evidence followed by an actual inspection of the trunk of the Caprice.

J. Testimony Regarding Terror in the Community

Robert Saady, a convenience store operator in Ashland, Virginia testified at trial about the impact of the sniper shootings on his business, his employees, and other businesses in the Ashland area. Montgomery County Police Sergeant Robert Thompson testified at trial concerning the shootings in the Washington D.C. area. Muhammad argues in assignments of error 59 and 61 that Saady's testimony was "irrelevant, speculative, and immaterial," and that Thompson's testimony was "cumulative, irrelevant and immaterial." He argues that proof of actual fear in the community is not probative of Muhammad's intent.

School officials in three different school systems also testified about the impact of the sniper shooting upon personnel, students and parents, and the operation of the schools. However, the only assignments of error before this Court involve the testimony of Saady and Thompson.

With regard to Thompson, Muhammad objected only to specific questions not the overall nature of the testimony.

None of those specific objections are made the subject of argument in his brief. With regard to Saady, Muhammad did object to the relevance of his testimony in its entirety. Section 18.2-46.4 required proof that Muhammad intended to "intimidate the civilian population at large or . . . influence the conduct or activities of the government . . . through intimidation." It is an axiom of law and human behavior that one may infer that a person intends to produce the consequences reasonably anticipated from his acts. Wilson v. Commonwealth, 249 Va. 95, 101, 452 S.E.2d 669, 673, cert. denied, 516 U.S. 841 (1995); see also Mickens v. Commonwealth, 247 Va. 395, 408, 442 S.E.2d 678, 687, rev'd on other grounds, 513 U.S. 922 (1994); Green v. Commonwealth, 223 Va. 706, 711, 292 S.E.2d 605, 608 (1982); Barrett v. Commonwealth, 210 Va. 153, 156, 169 S.E.2d 449, 451 (1969). As such, testimony about what was actually and reasonably produced by Muhammad's conduct was relevant to prove his intent. The trial court did not err in permitting such testimony.

K. Motion to Quash Eyewitness Identifications

In assignment of error 25, Muhammad alleges that "the court erred in denying the motion to quash and suppress as unreliable various eyewitness identifications." In his one paragraph argument in his brief, Muhammad offers insufficient

argument in support of his assignment of error.  It is waived.

Rule 5:17(c); <u>Powell</u>, 267 Va. at 135, 590 S.E.2d at 54.

XI.  Sentencing

A.  Torture, Aggravated Battery, or Depravity of Mind

In assignment of error 12, Muhammad asserts that:

> It was error to deny the motion to preclude
> sentence of death based on vileness factor and
> allow the Commonwealth to base its request for
> the death sentence on the "vileness" factor,
> since there was no evidence of torture,
> aggravated battery, or depravity of mind.

Muhammad raised this issue in a pre-trial motion which the

trial court took under advisement until the evidence had been

presented.  At the conclusion of the presentation of the

evidence, Muhammad expressly stated that he objected to the

case being presented to the jury based upon torture or

aggravated battery.  Muhammad's assignment of error is in the

disjunctive.  He claims that there was no evidence of torture,

aggravated battery, or depravity of mind.  He did not object

to "depravity of mind" as a predicate finding for vileness.

The trial court ruled that it would not include "torture" in

the instructions.  Muhammad's objections in the trial court do

not preserve assignment of error 12.  Rule 5:25; Rule 5:17.

B.  Victim Impact Testimony

Muhammad argues in assignment of error 11 that it was

error under the due process clause to permit victim impact

96

testimony during the penalty phase of his trial.  He argues

that prior to 1998, the Virginia capital sentencing scheme

"only contemplated the presentation of victim impact testimony

to the judge prior to the imposition of sentence."  To the

extent that this statement provides a separate grounds for his

assignment of error, it is barred from review because the

issue was not raised in the trial court.  Rule 5:25.  With

respect to Muhammad's complaint about victim impact evidence

presented to a jury, we have previously considered such claims

and have rejected them.  Beck v. Commonwealth, 253 Va. 373,

385, 484 S.E.2d 898, 906, cert. denied, 522 U.S. 1018 (1997);

Weeks, 248 Va. at 476, 450 S.E. 2d at 389.  We see no reason

to revisit our previous decisions.

### C.  Unadjudicated Criminal Conduct

Muhammad alleges in assignments of error 77, 78, 79, 80,

81, 82, and 83 that the trial court erred in admitting

multiple instances of unadjudicated criminal conduct.  As

previously discussed, he has waived assignments of error 78,

79, 80, 82, and 83 for failure to adequately brief the issues.

Rule 5:17(c).  We will turn our attention to assignments of

error 77 and 81.  Assignment of error 77 states:

> The court erred by allowing unadjudicated acts
> to be received into evidence by the jury
> without any standard of proof or
> particularized burden on the Commonwealth to
> prove such acts to a specific standard of

proof in violation of Mr. Muhammad's right to
due process under the Virginia and United
States Constitutions.

As stated, assignment of error 77 is unspecific.  We must look to other assignments of error to place his complaint in a particular context.  The only specific issue involving unadjudicated criminal conduct properly before us on appeal is the subject of assignment of error 81 concerning testimony about an alleged escape attempt from the Prince William County Adult Detention Center.

The Commonwealth presented evidence of the attempted escape through two witnesses, without objection from the defendant.  Only after the completion of all the evidence from the prosecution and the defense at the sentencing phase and after both parties had rested, did Muhammad move to strike the evidence of the attempted escape.  The trial court properly denied the motion because it was untimely.  In order to preserve an issue for appeal, an objection must be made contemporaneously or it is waived.  Muhammad has failed to preserve assignments of error 77 and 81.  Rule 5:25.

D.  Testimony of Mildred Muhammad

In assignments of error 84 and 85, Muhammad asserts that the trial court erred in allowing Mildred Muhammad, ("Mildred"), the defendant's former wife, to testify about

statements made to her by her lawyer in Tacoma, Washington and a statement made by their child, Taalibah.

Mildred testified that the lawyer representing her in a custody proceeding told her to leave town quickly because of fear that Muhammad would find her and kill her. Muhammad objected to this statement on the grounds of hearsay. The trial court overruled the objection because it was not offered for the truth of the matter asserted; rather, it was offered to show why Mildred left Washington State and moved to the suburbs of Washington, D.C. The trial court gave the jury a limiting instruction directing it that the evidence was to be considered only to prove that she moved because of the statement made by her lawyer. After further discussion with counsel, the court gave an additional limiting instruction drafted by Muhammad. Also, Mildred testified that her daughter, Taalibah, said to her that if Muhammad "gets out," she was concerned that he would kill her mother. Muhammad objected on the grounds of hearsay.

Muhammad maintains on appeal that allowing such statements violated his Sixth Amendment right to confront witnesses against him and violated the rule established in Crawford. Crawford had not been decided at the time of Muhammad's trial. He made no objection based upon the Sixth Amendment to the testimony of his former wife. These issues

99

will not be considered for the first time on appeal.  Rule 5:25.

The trial court did not err in admitting Mildred's testimony regarding her lawyer's statement to her.  It was not hearsay because it was not offered for the truth of the matter asserted.  Chandler v. Graffeo, 268 Va. 673, 682, 604 S.E.2d 1, 5 (2004).  A proper limiting instruction was given, not once, but twice.  One of the instructions was drafted by Muhammad.  A jury is presumed to have followed the instructions of the trial court.  Green v. Young, 264 Va. 604, 611, 571 S.E.2d 135, 139 (2002) (citing Zafiro v. United States, 506 U.S. 534, 540 (1993)).

With regard to Mildred's testimony about her daughter's statement to her, the record reveals a more complicated context.  Muhammad objected on the grounds of hearsay and relevancy, not on Sixth Amendment grounds.  It is significant that the Commonwealth did not seek to introduce Mildred's testimony about her daughter's statement until after the trial court, over the Commonwealth's objection, ruled that it would allow Muhammad to present to the jury several letters written to him from his children, including Taalibah, which gave the impression that the children had no fear of him.  After considerable argument from counsel, the trial court ruled that all the letters Muhammad sought to introduce would be allowed

and a single statement from Taalibah to her mother would also be allowed.  The trial court ruled that all of this evidence was admissible pursuant to the state-of-mind exception to the hearsay rule.  The Commonwealth also argued that Taalibah's statement should be independently admissible as rebuttal to Muhammad's introduction of the letters.

The nature of the evidence offered by Muhammad was to show his relationship with his children.  He offered out of court statements in the form of letters from his children for this purpose.  Similarly, the Commonwealth offered an out of court oral statement from Taalibah for the same purpose.  Upon review of the record, we hold that, if the admission of Taalibah's statement was error, it was invited error.  We will not "notice error which has been invited by the party seeking to take advantage thereof on appeal."  Saunders v. Commonwealth, 211 Va. 399, 400, 177 S.E.2d 637, 638 (1970); Clark v. Commonwealth, 202 Va. 787, 791, 120 S.E.2d 270, 273 (1961).  Muhammad's introduction of evidence showing the state of mind of his children toward him – arguing that such proof was both relevant and not objectionable hearsay – surely invited evidence of a similar nature from the Commonwealth. Whether as evidence in its case in chief or as rebuttal evidence, the trial court did not err in permitting Mildred to testify about Taalibah's statement.

## XII.  Jury Instructions

In assignments of error 86, 87, 89, 90, 91, 92, 93, 94, and 95, Muhammad alleges defects in the instruction of the jury.

### A.  Aggravated Battery

Muhammad objected to the trial court's instruction to the jury that it could find the aggravating factor of vileness under Code § 19.2-264.2 from proof of aggravated battery in the death of Dean Meyers.  Muhammad asserts that a single shot has never qualified as an aggravated battery.  We have defined aggravated battery as "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder."  Smith v. Commonwealth, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), cert. denied, 441 U.S. 967 (1979).  Muhammad asserts that, in a shooting case, this Court has always required more than one gunshot to satisfy the requirements of aggravated battery.

In Hedrick v. Commonwealth, 257 Va. 328, 513 S.E.2d 634, cert. denied, 528 U.S. 952 (1999), we noted that the clear language of Code § 19.2-264.2 demonstrates that "the term 'vileness' includes three separate and distinct factors, with proof of any one factor being sufficient to support a finding of vileness and hence a sentence of death."  Id. at 341-42,

513 S.E.2d at 640. Those factors are torture, depravity of mind, or aggravated battery to the victim.

The significance and effect of Muhammad's argument attacking the aggravated battery instruction must be assessed in the context of the other jury instructions and the jury's actual findings. Jury instruction 14 dealt with the offense of "the killing of Dean Meyers as part of the killing of more than one person in a three-year period." Jury instruction 14A dealt with the offense of "the killing of Dean Meyers in the commission or attempted commission of an act of terrorism." Each of the instructions included direction to the jury that the penalty of death could not be imposed for either of the offenses unless the Commonwealth proved beyond a reasonable doubt at least one of the following aggravating circumstances:

> 1. That, after consideration of his history and background, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society; or

> 2. That his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder.

For each of the offenses, the jury's verdict forms expressly found that Muhammad "would commit criminal acts of violence that would constitute a continuing serious threat to society,"

103

and that "the offense was outrageously or wantonly vile, horrible, or inhuman." Additionally, each of the verdict forms expressed findings of both "[d]epravity of mind" and "[a]ggravated battery to the victim beyond the minimum necessary to accomplish the act of murder." Based upon these multiple findings, the jury unanimously fixed Muhammad's punishment at death for each of the offenses.

Even if the trial court erred in granting an instruction based upon aggravated battery, the error would be harmless beyond a reasonable doubt. The jury's verdict of death for each of the offenses was predicated upon additional and independent findings of future dangerousness and vileness based upon depravity of mind.

### B.  Future Dangerousness Instruction

Muhammad argues in his brief that the future dangerousness instruction given is unconstitutionally vague. The Court can find no assignment of error that attacks this instruction on that basis. Furthermore, his one sentence conclusory argument is inadequate. We will not consider the argument.  Rule 5:17(c).

### C.  Finding Instruction

In assignment of error 91, Muhammad alleges that the trial court erred in failing to instruct the jury "that the verdict be unanimous as to any aggravating factors."

104

Muhammad's argument on this point is a one-sentence repetition of his assignment of error.  It is inadequate argument and will not be considered.  Rule 5:17(c).

### D.  Life Without Parole

In assignments of error 87 and 90, Muhammad maintains that the trial court erred in granting the Commonwealth's proposed instructions "without including the 'life without the possibility of parole' language."  He further argues that the trial court should have granted his proposed instruction with such language.  Once again, Muhammad, in one sentence conclusory arguments, simply repeats the language of the assignment of error and offers no argument.  The assignments of error are deemed waived.  Rule 5:17(c).

### E.  Remaining Issues Relating to Instructions

Numerous other issues are waived by Muhammad for failure to make sufficient argument in his brief.  He makes insufficient argument that:

1. The trial court should have granted his instruction K defining mitigation.  Additionally, here the trial court did define mitigation, it simply refused to highlight any particular evidence as Muhammad wanted;
2. The trial court should have instructed the jury that it could consider life without parole in determining aggravating factors and as a mitigating factor;
3. The trial court should have given his instruction L because the jury was  "left directionless" as to how to "weigh" mitigation evidence;
4. The trial court should have instructed the jury that the vileness factor applied only to Meyers' killing.  Additionally, here the instruction offered was incorrect

105

because the vileness factor could be found based upon depravity of mind as well;

5. The trial court should have granted his instruction T regarding mitigating evidence to be considered in weighing culpability and future violence.  The entirety of his argument consists of the following: "The jury was entitled to this guidance."

6. The trial court did not make it clear in instructions that the jury could impose life in prison even if it found aggravating factors.  The record demonstrates that the jury was properly instructed on this matter.

For each of these matters (1 - 6), Muhammad fails to make sufficient argument in his brief.  The matters are waived. Rule 5:17(c).

### XIII.  Pretrial Publicity and the Right to a Fair Trial

In assignments of error 5, 23, 24, and 28, Muhammad makes various arguments concerning alleged errors of the trial court concerning its handling of pretrial publicity.  Muhammad argues that:

1. The trial court erred by denying his motion to issue a show cause order, quashing subpoenas related to seeking evidence of pretrial leaks of information concerning the investigation of Muhammad and Malvo, and denying a request for appointment of a special prosecutor to investigate pretrial leaks;

2. The trial court erred by denying Muhammad's motion to close a hearing on a motion in limine;

3. The trial court erred in failing to prevent information leaks and to take appropriate corrective action concerning the leaks;

4. The trial court erred in refusing to dismiss the charges against Muhammad based upon leaks of information;

5. The leaks "hindered the defendant's ability to seat a fair jury despite the change of venue."

This case attracted extensive media coverage. Counsel for Muhammad and the Fairfax Commonwealth's Attorney agreed to a consent order in the Fairfax County Circuit Court, where Malvo's prosecution was pending, generally prohibiting law enforcement officials of the Fairfax County Police Department and its civilian employees from disclosing information in violation of the Department's own rules, namely, General Order 401.1. Among other things, General Order 401.1 and the consent order in Fairfax County Circuit Court specifically prohibit disclosure of evidence of statements, criminal records, opinions of guilt or innocence, testing and test results, and statements about expected testimony. Additionally, counsel for Muhammad and the Commonwealth's Attorney for Prince William County agreed that all discovery from the Commonwealth would be sealed to limit dissemination of information that might have an effect upon jury selection.

Due to continued concerns about allegations of leaks of information related to the investigation and prosecution of Muhammad and Malvo, Muhammad filed a motion for rule to show cause in the Prince William County Circuit Court requesting that the trial court determine the source of information appearing in the media concerning the Malvo and Muhammad cases which had been attributed to law enforcement sources, and take appropriate action. In the alternative, Muhammad requested

that the trial court appoint a special prosecutor or investigator. The trial court denied the motion. A similar motion had been presented to the Circuit Court of Fairfax County and was denied.

Thereafter, Muhammad and the Prince William County Commonwealth's Attorney agreed to the entry of an order on August 5, 2003, providing in pertinent part:

> Law enforcement employees, from all agencies
> working as members of the prosecution Task
> Force, or working with the Task Force, whether
> sworn officers/agents or civilian employees
> shall not disclose any information to the
> press or public related to the investigation
> leading to the arrests of John Allen Muhammad
> and Lee Boyd Malvo, and pending prosecution of
> John Allen Muhammad and Lee Boyd Malvo in
> Prince William and Fairfax County Circuit
> Courts.

Approximately two weeks before the commencement of Muhammad's trial, a book entitled "Sniper: Inside The Hunt For The Killers Who Terrorized The Nation," was released to the public. This 237-page publication contained detailed information concerning the investigation of Muhammad and Malvo. Muhammad filed a motion to dismiss the charges or for other appropriate relief asserting that there had been a flagrant violation of the August 5, 2003 order by numerous and unknown law enforcement agents. In the motion, Muhammad did not fault the prosecutors in the case and did not argue that there had been any discovery violations under Rule 3A:11.

The trial court expressed its concern about the matter but disagreed regarding Muhammad's proposed remedies. In the absence of any violations of the discovery rules, the trial court declined to prohibit introduction of specified evidence of the Commonwealth. The trial court declined to order that the Commonwealth could not seek the death penalty. The trial court indicated that it would allow individual voir dire of potential jurors on the issue of pre-trial publicity. The trial court had already granted a motion for change of venue and the trial was scheduled to be held in Virginia Beach, Virginia.

Muhammad asserts that the trial court should have dismissed the charges, precluded the death penalty, or limited the introduction of evidence pursuant to the authority of Code § 19.2-265.4. However, this code section recites potential remedies for failure to provide discovery under Rule 3A:11. Muhammad expressly stated in his motion that no discovery violations under the rule had occurred.

In his motion, Muhammad does not suggest that the Commonwealth's Attorney's office of Prince William County was the source of leaks. Additionally, there is no evidence that the information contained in the book published before trial came from leaks after the August 5, 2003 order. The trial court noted that it was likely that most of the information in

109

the book came from communications prior to the time the trial court was asked to intervene and prohibit disclosure of any information regarding the Muhammad and Malvo investigations.

In his brief on this matter, Muhammad cites one statute, which does not apply, and no cases, in support of his argument that Muhammad was not tried by a fair and impartial jury or that his trial was in any way tainted by pretrial publicity. Upon review of the record, we conclude that the trial court took appropriate action to limit the effect of pretrial publicity in this case. The trial court entered a consent order regarding sealing of discovery responses of the Commonwealth; when asked, the trial court entered the August 5, 2003 order prohibiting law enforcement and civilian employees of law enforcement agencies from disclosing to the media or the public any information concerning the investigation of Muhammad and Malvo; the trial court granted Muhammad's motion for a change of venue to a location away from the immediate zone of pretrial publicity; and, the trial court permitted individualized voir dire of potential jurors concerning pretrial publicity.

Muhammad does not cite any actual tainting of the jury selection process or any way in which his trial was compromised by pretrial publicity. He does not cite any particular consequences of the trial court's denial of a

motion to close a hearing on a motion in limine or the trial court's refusal to issue show cause orders or appoint a special prosecutor to investigate leaks. It is most telling that at trial, of the 125 potential jurors questioned, only 8 were challenged on grounds that exposure to pretrial publicity made them inappropriate jurors. We hold that the trial court did not err with regard to any of the issues raised in Muhammad's assignments of error 5, 23, 24 and 28.

XIV. Miscellaneous Constitutional Challenges
to the Death Penalty

In assignments of error 13, 21, and 26, Muhammad raises numerous issues relating to the constitutionality of the death sentence generally and as it is applied in Virginia. Support for many of his arguments is not found in his brief. Rather, Muhammad attempts to incorporate by reference various motions, memoranda, and argument made in the trial court. We have previously held that such a practice is impermissible. Schmitt, 262 Va. at 138, 547 S.E.2d at 194; Burns v. Commonwealth, 261 Va. 307, 319, 541 S.E.2d 872, 881, cert. denied, 534 U.S. 1043 (2001). We will not consider such arguments. They are waived. Rule 5:17(c).

Other matters raised in these assignments of error and argued in Muhammad's brief have been previously decided by this Court:

111

(1) Virginia statutes fail to provide meaningful guidance to the jury because the aggravating factors are vague, rejected in Jackson, 267 Va. at 205-06, 590 S.E.2d at 535 (dangerousness); Powell, 267 Va. at 136, 590 S.E.2d at 554 (both); Wolfe, 265 Va. at 208, 576 S.E.2d at 480;

(2) The Virginia scheme fails to provide the jury with guidance regarding its consideration of mitigating evidence, rejected in Buchanan v. Angelone, 522 U.S. 269, 275-76 (1998); Jackson, 267 Va. at 206, 590 S.E.2d at 536; Johnson, 267 Va. at 69, 591 S.E.2d at 56; Jackson v. Commonwealth, 266 Va. 423, 429, 587 S.E.2d 532, 538 (2003); Lovitt, 260 Va. at 508, 537 S.E.2d at 874;

(3) The Commonwealth is permitted to prove future dangerousness by evidence of unadjudicated criminal conduct without any standard of proof, rejected in Jackson, 267 Va. at 206, 590 S.E.2d at 536; Powell, 267 Va. at 136, 590 S.E.2d at 554; Johnson, 267 Va. at 70, 591 S.E.2d at 56; Bell v. Commonwealth, 264 Va. 172, 203, 563 S.E.2d 695, 716 (2002), cert. denied, 537 U.S. 1123 (2003). Additionally, we note that all Muhammad's assignments of error regarding unadjudicated criminal conduct have been rejected either because they were not preserved in the trial court (Rule 5:25) or they have been inadequately briefed (Rule 5:17(c)). Consequently, no issues related to unadjudicated criminal conduct are properly before the Court.

(4) The statute allows, but does not require, that a sentence of death be set aside upon a showing of good cause and permits the court to consider hearsay in a post-sentence report, rejected in Jackson, 267 Va. at 206, 590 S.E.2d at 536; Powell, 267 Va. at 136, 590 S.E.2d at 555;

Johnson, 267 Va. at 70, 591 S.E.2d at 56;
Jackson, 266 Va. at 430, 587 S.E.2d at
539;

(5) This Court fails to conduct an adequate
proportionality review and
passion/prejudice review, rejected in
Jackson, 267 Va. at 206, 590 S.E.2d at
536; Powell, 267 Va. at 136, 590 S.E.2d
at 555; Johnson, 267 Va. at 70, 591
S.E.2d at 56.

XV.   Statutory Review

Muhammad does not argue that his sentences of death are

excessive, arbitrarily imposed, or disproportionate to other

similar cases.   Nonetheless, pursuant to Code § 17.1-

313(C)(2), we must conduct a review of these issues.

Upon review of the record, we conclude that the trial

court conducted the proceedings related to this case with

patience and fairness.   Muhammad was given access to the trial

court to present each and every issue he desired to present

and was entitled to present.   The jury selection process was

untainted by pretrial publicity. The trial court's granting of

the motion to change venue provided additional protection to

the right of the defendant to a fair trial.   The record

contains no reversible error.   Simply stated, we find not even

a hint of arbitrariness or prejudice in the conduct of the

trial or the jury's imposition of the sentences of death.

Our proportionality review is not undertaken to "insure

complete symmetry among all death penalty cases."   Orbe v.

113

Commonwealth, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999), cert. denied, 529 U.S. 1113 (2001).  The review we employ is done to "identify and invalidate the aberrant death sentence." Id.

With regard to the death sentences imposed for the killing of more than one person in three years or in the same act or transaction we have reviewed our cases involving the killing of two or more people.  Of the fourteen cases in which the death sentence was given, five involved more than two killings.  Buchanan v. Commonwealth, 238 Va. 389, 384 S.E.2d 757 (1989), cert. denied, 493 U.S. 1063 (1990) (four victims); Barnes v. Commonwealth, 234 Va. 130, 360 S.E.2d 196 (1987), cert. denied, 484 U.S. 1036 (1988) (two victims); Davidson v. Commonwealth, 244 Va. 129, 419 S.E.2d 656, cert. denied, 506 U.S. 959 (1992) (three victims); Thomas v. Commonwealth, 244 Va. 1, 419 S.E.2d 606, cert. denied, 506 U.S. 958 (1992) (two victims); Stewart v. Commonwealth, 245 Va. 222, 427 S.E.2d 394, cert. denied, 510 U.S. 848 (1993) (two victims); Burket v. Commonwealth, 248 Va. 596, 450 S.E.2d 124 (1994), cert. denied, 514 U.S. 1053 (1995) (two victims); Goins v. Commonwealth, 251 Va. 442, 470 S.E.2d 114, cert. denied, 519 U.S. 887 (1996) (five victims plus the death of a fetus); Kasi v. Commonwealth, 256 Va. 407, 508 S.E.2d 57 (1998), cert. denied, 527 U.S. 1038 (1999) (two victims); Bramblett v.

Commonwealth, 257 Va. 263, 513 S.E.2d 400, cert. denied, 528 U.S. 952 (1999) (four victims); Walker v. Commonwealth, 258 Va. 54, 515 S.E.2d 565 (1999), cert. denied, 528 U.S. 1125 (2000) (two victims); Zirkle v. Commonwealth, 262 Va. 631, 553 S.E.2d 520 (2001) (two victims); Hudson v. Commonwealth, 267 Va. 29, 590 S.E.2d 362 (2004) (three victims); Elliott v. Commonwealth, 267 Va. 396, 593 S.E.2d 270 (2004), cert. denied, ___ U.S. ___, 125 S.Ct. 875 (2005) (two victims); Winston v. Commonwealth, 268 Va. 564, 604 S.E.2d 21 (2004) (two victims).

In the cases in which the death sentence was sought but a life sentence was given, of the fourteen cases only four involved the killing of more than two persons and three of those cases had unusual circumstances. Woodfin v. Commonwealth, 236 Va. 89, 372 S.E.2d 377 (1988), cert. denied, 490 U.S. 1009 (1989) (two victims); Mundy v. Commonwealth, 11 Va. App. 461, 390 S.E.2d 525 (1990), cert. denied, 502 U.S. 840 (1991) (two victims); Moran v. Commonwealth, No. 1708-90-3 (Va. Ct. App. Nov. 5, 1991) (two victims); Stephenson v. Commonwealth, No. 2080-91-1 (Va. Ct. App. Jan. 11, 1993) (two victims); Hamlin v. Commonwealth, No. 1279-99-2 (Va. Ct. App. Apr. 25, 2000) (four victims killed by arson); Novak v. Commonwealth, 20 Va. App. 373, 457 S.E.2d 402 (1995), cert. denied, 519 U.S. 1006 (1996) (two victims); Pritchett v.

115

*Commonwealth*, No. 1968-95-3 (Va. Ct. App. Apr. 1, 1996) (two victims); *Owens v. Commonwealth*, No. 2259-95-1 (Va. Ct. App. Nov. 19, 1996) (four victims; defendant was 16 years old at time of offense); *Williams v. Commonwealth*, No. 2423-96-2 (Va. Ct. App. Oct. 28, 1997) (three victims; defendant was alleged to be brain-damaged and border-line mentally retarded); *Stoneman v. Commonwealth*, No. 3069-96-3 (Va. Ct. App. June 9, 1998) (two victims); *Evans v. Commonwealth*, No. 2089-99-3 (Va. Ct. App. Apr. 26, 2000) (two victims); *Burlile v. Commonwealth*, 261 Va. 501, 544 S.E.2d 360 (2001) (two victims); *Hairston v. Commonwealth*, No. 1722-01-3 (Va. Ct. App. Mar. 28, 2002) (two victims); *Cooper v. Commonwealth*, No. 0819-03-4 (Va. Ct. App. Aug. 24, 2004) (three victims).

Additionally, we reviewed two cases in which the Commonwealth did not seek the death penalty for the killing of two or more persons.  In those two cases there were only two murders in each case.  *Smith v. Commonwealth*, No. 0628-93-1 (Va. Ct. App. Feb. 1, 1994) (two victims); *Hobbs v. Commonwealth*, No. 1301-99-1 (Va. Ct. App. Mar. 17, 2000) (two victims).

Apart from the Cooper case, except where unusual circumstances existed, all the capital prosecutions in Virginia that we have reviewed wherein more than two people

were murdered and the prosecution was based upon Code § 18.2-31(7) or (8) resulted in the death penalty being imposed.

This case represents the first capital murder case with a death sentence under the terrorism statute.  We are unaware of any state that has reviewed a death sentence predicated upon a similar provision.

We think the death penalty is not an excessive nor a disproportionate penalty for a case with evidence of ten murders and six malicious woundings.  Similarly, the evidence presented on the terrorism count independently supports the imposition of the death penalty.

Muhammad's crimes cannot be compared to any other case in the Commonwealth.  The evidence of vileness and future dangerousness in support of the jury's verdict justifies its sanction of death.

Muhammad with his sniper team partner, Malvo, randomly selected innocent victims.  With calculation, extensive planning, premeditation, and ruthless disregard for life, Muhammad carried out his cruel scheme of terror.  He did so by employing stealth and secrecy using a sniper methodology that put his victims at great risk while reducing his own.  He employed a weapon with truly awesome power to inflict massive injury upon his victims.  Muhammad recruited a younger boy,

Malvo, and carefully trained and guided him in this murderous enterprise.

His victims came from all walks of life who were engaged in everyday pursuits when their lives were tragically ended or altered.  Paul LaRuffa, Muhammad Rashid, Hong Im Ballenger, Claudine Parker, and Kelly Adams were closing and leaving their places of business.  Sarah Ramos was sitting on a bench in front of a store.  Lori Lewis-Rivera was vacuuming her car at a gas station.  Paschal Charlot was crossing an intersection as a pedestrian.  Caroline Seawell and Linda Franklin were putting packages in their respective automobiles.  Iran Brown was walking to school.  Dean Meyers, Kenneth Bridges, and Premkumar Walekar were putting fuel in their vehicles at gasoline stations.  Jeffrey Hopper was leaving a restaurant after a meal. Conrad Johnson, a bus driver, was standing in the doorway of his bus.  Muhammad inflicted death or massive injury upon these victims as he pursued his mission of terror.

Muhammad's threats to those within the communities he stalked including the warning, "Your children are not safe anywhere at anytime."  He communicated his desire to extort money from the government through the demand to deposit ten million dollars in an account connected to a card for accessing the account through automated teller machines.

Whatever else may have been his intentions, he certainly intended to intimidate the civilian population and to influence the conduct and activities of government.  He did so with breathtaking cruelty.  If society's ultimate penalty should be reserved for the most heinous offenses, accompanied by proof of vileness or future dangerousness, then surely, this case qualifies.

## XVI.  Conclusion

Upon review of the record and upon consideration of the arguments presented, we find no reversible error in the judgment of the trial court.  Further, we find no reason to commute or set aside the sentences of death.  We will affirm the judgment of the trial court.

<u>Affirmed</u>.

JUSTICE KINSER, concurring.

I fully agree with the majority opinion in this case.  I write separately to address the dissent's failure to view the evidence in the light most favorable to the Commonwealth, to consider the circumstantial evidence, and to address the Commonwealth's theory of the case.  Unlike the dissent, I conclude that the Commonwealth did indeed prove beyond a reasonable doubt that John Allen Muhammad was a principal in the first degree in the murder of Dean Meyers under Code

§ 18.2-31(8), "[t]he willful, deliberate, and premeditated killing of more than one person within a three-year period."

Certain basic and well-established principles must guide the appellate review of this case. When the sufficiency of the evidence is challenged on appeal, this Court must view the evidence and all reasonable inferences flowing therefrom in the light most favorable to the prevailing party at trial, in this case the Commonwealth. Commonwealth v. Norman, 268 Va. 539, 545-46, 604 S.E.2d 82, 85 (2004); Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786, cert. denied, 540 U.S. 972 (2003). It is our duty to affirm the trial court's judgment unless that judgment is plainly wrong or without evidence to support it. Code § 8.01-680; Barrett v. Commonwealth, 268 Va. 170, 179, 597 S.E.2d 104, 108 (2004); Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).

In viewing the evidence in the light most favorable to the prevailing party at trial, we must consider all the evidence, both direct and circumstantial. "There is no distinction in the law between the weight or value to be given to either direct or circumstantial evidence." Hudson, 265 Va. at 512, 578 S.E.2d at 785. "Indeed, in some cases circumstantial evidence may be the only type of evidence which can possibly be produced." Stamper v. Commonwealth, 220 Va.

260, 272, 257 S.E.2d 808, 817 (1979), <u>cert. denied</u>, 445 U.S. 972 (1980) (citing <u>Toler v. Commonwealth</u>, 188 Va. 774, 780, 51 S.E.2d 210, 213 (1949)).

Instead of adhering to these principles of appellate review, the dissent presents the evidence in the light most favorable to Muhammad rather than the Commonwealth. The dissent does so by failing to address the compelling circumstantial evidence concerning the other 15 shootings that occurred during a span of 47 days in addition to the Meyers shooting and the similarities among those shootings that demonstrate the method employed by Muhammad and Lee Boyd Malvo in the murder of Meyers. There is no mention of the forensic evidence establishing that the .223 caliber Bushmaster rifle recovered when Muhammad and Malvo were apprehended was used in 13 of the 16 shootings, including the Meyers murder, or the evidence showing that the rifle is equivalent to a type of weapon used by military snipers. Likewise, the dissent takes no notice of the fact that, in 10 of the 16 shootings, the Caprice that Muhammad purchased after the first shooting and in which he and Malvo were sleeping when arrested was seen in the vicinity of those shootings, including the Meyers shooting, either before, at the time of, or soon after they occurred. In the Meyers shooting, the Caprice actually was seen in the area both before and after the shooting.

The dissent further makes no reference to the alterations to the Caprice enabling the shooter in the two-man sniper team to fire a high-velocity rifle from the trunk while minimizing the shooter's visibility. Finally, there is no mention of the many tools used by sniper teams that were recovered in the Caprice along with the Bushmaster rifle: a bipod system for support of the rifle; holographic and telescopic scopes to aid sighting; global positioning system equipment to locate and relocate a vantage point for the long-range shot; "walkie-talkie" handheld radio sets for communication; bungee cords for easy "break down" of the rifle for transportation purposes; and silencers. The dissent's failure to consider all the evidence, both direct and circumstantial, in the light most favorable to the Commonwealth is contrary to the principles of appellate review.

The dissent also does not address the Commonwealth's theory of the case. The Commonwealth predicated its theory on the methodology employed by a two-man sniper team. The testimony of Sergeant Major Mark Spicer clearly demonstrated that such a team employs one member as the long-range "shooter" and the other member as the "spotter." The spotter's job is to determine when the target is within the zone of fire and a shot can be taken, given the other surrounding circumstances, and to inform the shooter, who is

positioned in an obscure place, of these facts and to give the order to shoot at the opportune moment.

It is the order to shoot that differentiates this case from the dissent's analogy to a "lookout" or "wheelman."  The typical lookout or wheelman in a robbery does not direct at what moment the robber brandishes a weapon at a bank teller or store clerk and demands money.  In the present case, it is that direct and immediate action by the spotter in giving the order to shoot that forms the basis of the Commonwealth's theory that Muhammad acted as a principal in the first degree.  Such conduct by the spotter in a two-man sniper team is not "indirect" and is not "the quintessence of a principal in the second degree."

The dissent, however, never explains why such action by the spotter would not make that person a principal in the first degree.  Instead, the dissent concludes that Malvo made the final decision about whom to shoot and when to do so.  The dissent states, again not in the light most favorable to the Commonwealth, that "Malvo could have picked any target and decided at any time to fire or not," and thereby reduce Muhammad's role to that of merely giving advice about the traffic flow on a multi-lane highway.  In other words, the dissent does not deal with the Commonwealth's theory that

Muhammad gave the order to shoot and the circumstantial evidence that supports the theory.

Under our case law, "where two or more persons take a direct part in inflicting fatal injuries, each joint participant is an 'immediate perpetrator,' " i.e., a principal in the first degree. Strickler v. Commonwealth, 241 Va. 482, 495, 404 S.E.2d 227, 235, cert. denied, 502 U.S. 944 (1991); see also Remington v. Commonwealth, 262 Va. 333, 349-50, 551 S.E.2d 620, 630 (2001), cert. denied, 535 U.S. 1062 (2002); Williams v. Commonwealth, 248 Va. 528, 545, 450 S.E.2d 365, 375 (1994), cert. denied, 515 U.S. 1161 (1995). In Strickler, the Commonwealth's theory was that Strickler and another individual had jointly participated in the actual killing. Id. at 494, 404 S.E.2d at 235. The Commonwealth argued that, since the victim's death was caused by the crushing of her skull with a 69-pound rock, it would have been necessary for one assailant to hold her down on the ground while the other assailant lifted the rock and dropped it on her head. Id. We agreed and concluded that the weight and size of the rock "made it apparent that a single person could not have lifted it and dropped or thrown it while simultaneously holding the victim down." Id. Even though the evidence did not show which assailant wielded the rock, we held that Strickler took a direct part in inflicting the fatal injuries and was

124

therefore an "immediate perpetrator." <u>Id.</u> at 495, 404 S.E.2d at 235.

Turning to the evidence in this case and viewing it in the light most favorable to the Commonwealth, I conclude that Muhammad, like Strickler, acted as a principal in the first degree. The dissent does not dispute, nor can it, that Muhammad, Malvo, the Caprice, and the Bushmaster rifle were all present at the scene of the Meyers shooting. In fact, soon after the shooting, Muhammad and the Caprice were seen in a parking lot directly across the street from the gas station where Meyers was shot. A police officer questioned Muhammad about why he was in the parking lot. Muhammad told the officer that the police had directed him into that parking lot. However, the officer explained that, after the shooting, the procedure was to direct traffic away from the area, not into it.

Also, a map containing both Muhammad's and Malvo's fingerprints was found in the parking lot. Forensic evidence established that the bullet recovered during the autopsy of Meyers' body was fired from the Bushmaster rifle. While only Malvo's fingerprints were found on the Bushmaster rifle, DNA matching that of both Muhammad and Malvo was found on the rifle.

125

The question is whether the "combined force" of this evidence along with "many [other] concurrent and related circumstances" surrounding not only the Meyers shooting but also the other 15 shootings and the sniper tools found in the Caprice when Muhammad and Malvo were apprehended establishes beyond a reasonable doubt that Muhammad acted as an immediate perpetrator in the Meyers killing. Hudson, 265 Va. at 514, 578 S.E.2d at 786 (citation omitted). Each piece of circumstantial evidence is not to be viewed in isolation. Id.

Soon after the Meyers shooting, the Caprice, with Muhammad in the driver's seat, was in a parking lot directly across a nine-lane highway from the gas station where Meyers was killed. The location of the parking lot provided a direct line of fire to the gas station. Due to the traffic on this multi-lane highway and the small hole in the trunk of the Caprice through which to fire the Bushmaster rifle, the jury could reasonably have inferred that the shooter fired upon order from the spotter because only the spotter could determine the opportune moment to fire a shot that would avoid oncoming vehicular traffic, then strike and kill the victim. See Inge v. Commonwealth, 217 Va. 360, 366, 228 S.E.2d 563, 567-68 (1976) ("it is within the province of the jury to determine what inferences are to be drawn from proved facts,

provided the inferences are reasonably related to those facts").

Thus, in this case, Muhammad was either the shooter, making him a principal in the first degree, or the spotter, also making him a principal in the first degree.  The evidence concerning all 16 shootings and the reasonable inferences flowing therefrom viewed in the light most favorable to the Commonwealth demonstrate that, in this two-man sniper team, the spotter took an immediate and direct action in the Meyers murder by giving the order to shoot, an act that, in my view, is equivalent to pulling the trigger or holding the victim down on the ground as in Strickler.  Such action by the spotter goes beyond the conduct of a principal in the second degree who merely encourages, incites, or aids in the commission of a crime.  See Jones v. Commonwealth, 208 Va. 370, 372-73, 157 S.E.2d 907, 909 (1967).

For these reasons, I respectfully concur and, like the majority, would affirm all the convictions.


JUSTICE AGEE, with whom JUSTICE LACY and JUSTICE KOONTZ join, dissenting in part and concurring in part.


The common law classification of criminal perpetrators that distinguished between principals in the first and second degree has become of limited significance in modern times.

Nearly all jurisdictions have enacted provisions similar to Virginia Code § 18.2-18, which erase the distinction between principals of the first and second degree by treating both categories of criminal actors as principals in the first degree for purposes of indictment, trial, conviction, and punishment.

However, the common law distinction between principals of the first and second degrees remains of significant importance in a case of capital murder in Virginia because the General Assembly has specifically provided in Code § 18.2-18 that a "principal in the second degree to a capital murder shall be indicted, tried, convicted and punished as though the offense were murder in the first degree." Thus, unless the Commonwealth proved beyond a reasonable doubt that John Allen Muhammad was a principal in the first degree to the murder of Dean Meyers under Code § 18.2-31(8), the plain language of Code § 18.2-18 bars conviction and punishment of Muhammad for capital murder under Code § 18.2-31(8). Accordingly, the common law distinction between acts sufficient to constitute a principal in the first degree and those of a principal in the second degree is of vital importance.

> At common law, a principal in the first degree is a person who engages in criminal conduct by his own hand—he fires the gun that kills, he takes and carries away the property of another.

128

. . . .

> At common law, a principal in the second
> degree is a person who is present at the
> scene of a crime, but does not engage in
> the criminal conduct; he merely aids and
> abets the principal in the first degree in
> committing the crime.  He may be actually
> present, assisting the principal in the
> first degree, standing ready to assist if
> needed, or commanding, counseling, or
> otherwise encouraging the principal in the
> first degree to commit the crime; or,
> although at a distance from the scene of
> the crime, he may be deemed present when
> he is acting as a driver of the getaway
> car or as a lookout with instructions to
> warn the principal in the first degree if
> anyone approaches.

1 Charles Torcia, Wharton's Criminal Law §§ 30-31 (15th ed. 1993).

Based on the record in this case, the Commonwealth did not prove that Muhammad was a principal in the first degree to the capital murder of Dean Meyers under Code § 18.2-31(8). Under established law, Muhammad may be a principal in the first degree to the Meyers murder in two circumstances: (1) if he actually shot Meyers or (2) if he and Lee Boyd Malvo are found to be joint principals, with each acting as an "immediate perpetrator" in the killing.  The record does not establish that the Commonwealth proved either circumstance.

Our decision in Rogers v. Commonwealth, 242 Va. 307, 410 S.E.2d 621 (1991), precludes finding that Muhammad is a principal in the first degree as the actual shooter of Meyers

129

under the facts of this case.  In Rogers, we reversed a defendant's capital murder conviction because the evidence placed the defendant and another man in the victim's house at the time of the murder and the Commonwealth failed to present "any evidence . . . which places the murder weapon in defendant's hands."  Id. at 319, 410 S.E.2d at 628.  "Stated differently, the Commonwealth . . . failed to exclude [the second man] as the perpetrator."  Id.

Following Rogers, Muhammad cannot be a principal in the first degree as the actual shooter of Meyers because the Commonwealth has not excluded Malvo as that person, and it presented no evidence that Muhammad was the actual shooter. "Because the circumstances of defendant's conduct do not exclude the reasonable hypothesis that [the second man (Malvo)] killed the victim, the capital murder prosecution fails."  Id. at 320, 410 S.E.2d at 629.  Therefore, Muhammad may not be convicted of Meyers' capital murder upon this record if the Commonwealth's position is Muhammad actually shot Meyers.

The Commonwealth primarily relies, however, on an expansive reading of the concept of "immediate perpetrator" based on Sergeant Spicer's theory of how a sniper team should operate.  The majority opinion adopts this theory and concludes both Malvo and Muhammad are culpable as principals

130

in the first degree because "actual participation together in a unified act" renders each an immediate perpetrator.  In doing so, the Commonwealth and the majority opinion reach beyond any precedent of this court and ignore clear foundations of the criminal law that have long defined the distinction between principals of the first and second degree. Our precedent establishes that co-actors in a capital murder can only be immediate perpetrators when each actor undertook a direct act "in the immediate presence of the victim's body when the fatal blows were struck and, hence, had jointly participated in the killing."  Strickler v. Commonwealth, 241 Va. 482, 494, 404 S.E.2d 227, 235 (1991), cert. denied, 502 U.S. 944 (1991).

In Coppola v. Commonwealth, 220 Va. 243, 257 S.E.2d 797 (1979), cert. denied, 444 U.S. 1103 (1980), the victim died from blows to the head.  Id. at 246, 257 & n.5, 257 S.E.2d at 800, 807 & n.5.  In the course of an armed robbery, the defendant beat the victim's head against the floor and a codefendant struck her in the head with his fist.  Id. at 246, 257 S.E.2d at 800.  We affirmed the defendant's death sentence finding him to be "an immediate perpetrator" because both he and his codefendant directly assaulted the victim as they "jointly participated in the fatal beating." Id. at 256, 257

S.E.2d at 806.  This action rendered the defendant a principal in the first degree.

In Strickler v. Commonwealth, 241 Va. 482, 404 S.E.2d 227 (1991), the evidence showed that the victim was killed by a blow to the head from a 69 pound rock.  We noted "a single person could not have lifted [the rock] and dropped or thrown it while simultaneously holding the victim down."  Id. at 494, 404 S.E.2d at 235.  We affirmed the conviction for capital murder holding that because the defendant "[took] a direct part in inflicting [the] fatal injuries" he was an "immediate perpetrator" and thus a principal in the first degree.  Id. at 495, 404 S.E.2d at 235.

In Lenz v. Warden, 265 Va. 373, 381, 579 S.E.2d 194, 199 (2003), cert. denied, ___ U.S. ___, 124 S.Ct. 2933 (2004), Lenz and another convict, Remington, inflicted "68 stab wounds and all the wounds contributed to the victim's death."  Lenz argued that "he could only be convicted of capital murder in the event the jury found beyond a reasonable doubt that he was the triggerman."  Id. (internal quotation marks omitted).  We disagreed, holding that "when two or more persons take a direct part in inflicting injuries, each joint participant is an immediate perpetrator for the purposes of the capital murder statutes."  Id. (citation and internal quotation marks omitted).

In <u>Remington v. Commonwealth</u>, 262 Va. 333, 551 S.E.2d 620 (2001), <u>cert</u>. <u>denied</u>, 535 U.S. 1062 (2002), Lenz' co-perpetrator was convicted for the same capital murder. We affirmed the trial court's denial of the defendant's proffered jury instructions that would have instructed the jury that he was a principal in the second degree unless he inflicted the actual fatal blow that caused the victim's death out of the many blows struck. Because the evidence established "that Remington and Lenz jointly participated in [the victim's] death[,]" we found that the trial court did not err in refusing the instruction. <u>Id</u>. at 350, 551 S.E.2d at 630.

Similarly, the Court of Appeals found the defendant in <u>Hancock v. Commonwealth</u>, 12 Va. App. 774, 407 S.E.2d 301 (1991), to be an immediate perpetrator of attempted capital murder by arson when he poured gasoline on a cushion while another person immediately ignited it. The court noted that "[b]oth men were principals in the first degree. Both provided the direct means to ignite the fire. Placing the flammable material in place for another to ignite it makes that person a perpetrator." <u>Id</u>. at 781, 407 S.E.2d at 305-06.

All of these cases involve direct, contemporaneous acts on the part of the co-perpetrators that combined to proximately inflict the injury on the victim. In each case, both perpetrators were physically present and personally

participated by a direct act against the victim to accomplish the murder, or to set the fire in Hancock.  In the case at bar, however, there is no such evidence of a similar direct act by Muhammad.

Assuming Muhammad acted as hypothesized by the Commonwealth's witness, Mark Spicer, in positioning the Caprice in the Bob Evans parking lot to face the gas station and communicating to Malvo that the coast was clear to fire at Meyers, that is not the act of a principal in the first degree under Virginia law.  Such conduct is the quintessence of activity by a principal in the second degree: "encouraging, inciting, or in some manner offering aid in the commission of the crime . . . lending countenance, or otherwise aiding while another did the act."  Jones v. Commonwealth, 208 Va. 370, 373, 157 S.E.2d 907, 909 (1967).

In that regard, Muhammad's actions were of the same character as those of a lookout or wheelman in a robbery. Such a person may provide the means and direction for the commission of the robbery by driving the actual perpetrators to the scene and keeping watch while the others directly commit the crime.  Like Muhammad, the wheelman may communicate by walkie-talkie or cell phone to the actual perpetrators instructing them as to when to commit the robbery and then

exit the premises in heavy traffic.[3]  Undoubtedly these acts

accord the actual perpetrators, who take the immediate and

direct action to effectuate the robbery, an easier task with

an increased likelihood of escape.  Nevertheless, no serious

argument can be made such a wheelman is a principal in the

first degree under our jurisprudence.

That is because the wheelman takes an indirect role, not

a direct role, in the crime of robbery.  He is present,

keeping watch and offering his counsel and direction to commit

the crime to the actual perpetrators, which is Muhammad's role

under the Commonwealth's theory of the case.  The wheelman is

an actual participant in the unified act of disparate persons

culminating in a robbery, just as Muhammad was an actual

participant in an act with Malvo that resulted in Meyers'

murder.  Neither the wheelman, nor Muhammad, in the given

circumstances, can be deemed an immediate perpetrator and thus

a principal in the first degree under Virginia law.

The crimes in Strickler, Coppola, Lenz, Remington and

Hancock could not have occurred without the direct,

contemporaneous, physical act of both perpetrators.  The fire

---

[3] Grant v. Commonwealth, 216 Va. 166, 168-69, 217 S.E.2d 806, 808 (1975) (lookout and driver of the getaway car convicted as principal in the second degree); Camphor v. State, 196 A.2d 75, 75 (Md. 1963) (accomplice who distracted the attention of a store clerk while immediate perpetrator stole a sewing machine was a principal in the second degree); Vincent v. State, 151 A.2d 898, 902-03 (Md. 1959) (lookout and driver of getaway car who provided a second set of clothing to the robbers was a principal in the second degree).

could not have been set without the direct, physical participation of both defendants in Hancock.  Similarly, the murder in Strickler could not have occurred without both perpetrators acting together directly on the victim.  The defendants in Coppola, Lenz and Remington each directly participated in the physical beating or stabbing of the victim.  These direct acts define an immediate perpetrator, rendering each actor a principal in the first degree, but stand in contrast to Muhammad's indirect acts.  The record in this case, viewed in the light most favorable to the Commonwealth, is simply devoid of the direct acts regarding a victim that our precedent requires to find Muhammad an immediate perpetrator acting as a principal in the first degree.

Assuming that the events occurred as the Commonwealth theorizes, it was nonetheless, Malvo, not Muhammad, who finally sighted the rifle to its target and made the ultimate decision to pull the trigger.  Malvo could have picked any target and decided at any time to fire or not.  While the range of Malvo's vision was more restricted than Muhammad's, the record reflects that Malvo was not "blind" and dependent on Muhammad in order to shoot Meyers.  Spicer's own testimony confirms the shooter had "a very large field of view by slightly moving [his] head left or right while still

maintaining a very small outward chance of . . . being seen."
The prosecutor even argued this point to the jury, noting that
the shooter had "a much wider field of vision and a much
narrower exposure."  Obviously, Muhammad's advice and
direction to Malvo of the traffic flow along the multiple lane
highway made Malvo's choice easier and more likely to succeed.
But in the end, it was Malvo who had to make the final
decision to shoot and performed the direct act of firing the
rifle.

Put simply, there is a failure of proof to establish
Muhammad as a principal in the first degree so as to sustain
his conviction under Code § 18.2-31(8).  The evidence in this
record, viewed in the light most favorable to the Commonwealth
and indulging all the inferences from its theory of the case,
establishes Muhammad's actions as those of a principal in the
second degree, "actually present, assisting the principal in
the first degree [Malvo], standing ready to assist if needed,
or commanding, counseling, or otherwise encouraging the
principal in the first degree to commit the crime," 1
Wharton's Criminal Law, supra, at § 31.  Conversely, this same
evidence of Muhammad commanding and directing Malvo's actions
effectively proves the requisite conduct for the conviction
under Code § 18.2-31(13) for "a killing pursuant to . . .
direction and order."  Code § 18.2-18.

Virginia law is clear that "a principal in the second degree, may [not] be convicted of capital murder under the provisions of [the] Code," Coppola, 220 Va. at 256, 257 S.E.2d at 806, unless one of the enumerated exceptions such as under Code § 18.2-31(13) applies.  Thus, we have noted that

> [o]nly the actual perpetrator of the crime may be convicted of capital murder . . .  Thus, neither an accessory before the fact nor a principal in the second degree may be so convicted. . . . The Commonwealth has the burden of proving beyond a reasonable doubt that one accused of capital murder was the actual perpetrator of the crime.  Suspicion of guilt, however strong, or even a probability of guilt is insufficient to support a conviction.

Rogers, 242 Va. at 317, 410 S.E.2d at 627 (citations and internal quotation marks omitted).

The General Assembly has specifically limited a capital murder conviction under Code § 18.2-31(8) by its enactment of Code § 18.2-18.  In doing so, the General Assembly has mandated that a principal in the second degree cannot be convicted of capital murder, but his conviction is limited to murder in the first degree.  This statutory mandate is binding on the judiciary until altered by the General Assembly.

For the forgoing reasons, Muhammad's conviction and sentence for the capital murder of Dean Meyers under Code § 18.2-31(8) should be reversed and remanded according to the statutory directive of Code § 18.2-18.  Accordingly, I

138

respectfully dissent from section II(B)(1) of the majority

opinion regarding the conviction and sentence under Code

§ 18.2-31(8). To the extent the conviction under Code § 18.2-

31(13) is based upon a principal in the first-degree analysis,

I respectfully dissent from section II(B)(2), but I concur in

the alternative ground in section II(B)(2) and would thus

affirm the conviction and sentence of death under Code § 18.2-

31(13). Otherwise, I concur in the majority opinion.